# WILLIAMS *v.* FLORIDA

No. 927.   Argued March 4, 1970—Decided June 22, 1970

*Richard Kanner* argued the cause and filed briefs for petitioner.

*Jesse J. McCrary, Jr.,* Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief were *Earl Faircloth,* Attorney General, and *Ronald W. Sabo,* Assistant Attorney General.

*Jack Greenberg* and *Michael Meltsner* filed a brief for Virgil Jenkins as *amicus curiae* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

Prior to his trial for robbery in the State of Florida, petitioner filed a "Motion for a Protective Order," seeking to be excused from the requirements of Rule 1.200 of the Florida Rules of Criminal Procedure. That rule requires a defendant, on written demand of the prosecuting attorney, to give notice in advance of trial if the defendant intends to claim an alibi, and to furnish the prosecuting attorney with information as to the place where he claims to have been and with the names and addresses of the alibi witnesses he intends to use.[1] In his motion petitioner openly declared his intent to claim an alibi, but objected to the further disclosure requirements on the ground that the rule "compels the Defendant in a criminal case to be a witness against himself" in violation of his Fifth and Fourteenth Amendment rights.[2] The motion was denied. Petitioner also filed a pretrial motion to impanel a 12-man jury instead of the six-

---

[1] The full text of the rule is set out in the appendix to this opinion, *infra,* at 104. Subsequent references to an appendix are to the separately bound appendix filed with the briefs in this case [hereinafter "App."].

[2] See App. 5.

man jury provided by Florida law in all but capital cases.[3] That motion too was denied. Petitioner was convicted as charged and was sentenced to life imprisonment.[4] The District Court of Appeal affirmed, rejecting petitioner's claims that his Fifth and Sixth Amendment rights had been violated. We granted certiorari.[5] 396 U. S. 955 (1969).

I

Florida's notice-of-alibi rule is in essence a requirement that a defendant submit to a limited form of pretrial discovery by the State whenever he intends to rely at trial on the defense of alibi. In exchange for the defendant's disclosure of the witnesses he proposes to use to establish that defense, the State in turn is required to notify the defendant of any witnesses it proposes to offer in rebuttal to that defense. Both sides are under a continuing duty promptly to disclose the names and addresses of additional witnesses bearing on the alibi as they become available. The threatened sanction for failure to comply is the exclusion at trial of the defendant's alibi evidence—except for his own testimony—or, in the case of the State, the exclusion of the State's evidence offered in rebuttal of the alibi.[6]

In this case, following the denial of his Motion for a Protective Order, petitioner complied with the alibi

---

[3] Fla. Stat. § 913.10 (1) (1967):

"Twelve men shall constitute a jury to try all capital cases, and six men shall constitute a jury to try all other criminal cases."

[4] See App. 82.

[5] The Supreme Court of Florida had earlier held that it was without jurisdiction to entertain petitioner's direct appeal from the trial court. See id., at 92. Under Florida law, the District Court of Appeal became the highest court from which a decision could be had. See Fla. Const., Art. V, § 4 (2); Fla. App. Rule 2.1a (5) (a); Ansin v. Thurston, 101 So. 2d 808, 810 (1958).

[6] "For good cause shown" the court may waive the requirements of the rule. Fla. Rule Crim. Proc. 1.200.

rule and gave the State the name and address of one Mary Scotty. Mrs. Scotty was summoned to the office of the State Attorney on the morning of the trial, where she gave pretrial testimony. At the trial itself, Mrs. Scotty, petitioner, and petitioner's wife all testified that the three of them had been in Mrs. Scotty's apartment during the time of the robbery. On two occasions during cross-examination of Mrs. Scotty, the prosecuting attorney confronted her with her earlier deposition in which she had given dates and times that in some respects did not correspond with the dates and times given at trial. Mrs. Scotty adhered to her trial story, insisting that she had been mistaken in her earlier testimony.[7] The State also offered in rebuttal the testimony of one of the officers investigating the robbery who claimed that Mrs. Scotty had asked him for directions on the afternoon in question during the time when she claimed to have been in her apartment with petitioner and his wife.[8]

We need not linger over the suggestion that the discovery permitted the State against petitioner in this case deprived him of "due process" or a "fair trial." Florida law provides for liberal discovery by the defendant against the State,[9] and the notice-of-alibi rule is itself carefully hedged with reciprocal duties requiring state disclosure to the defendant. Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927,[10]

[7] See App. 58–60.

[8] *Id.*, at 65–66.

[9] See Fla. Rule Crim. Proc. 1.220. These discovery provisions were invoked by petitioner in the instant case. See App. 3, 4, 8.

[10] See Epstein, Advance Notice of Alibi, 55 J. Crim. L. C. & P. S. 29, 32 (1964).

are now in existence in a substantial number of States.[11] The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played.[12] We find ample room in that system, at least as far as "due process" is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.

Petitioner's major contention is that he was "compelled . . . to be a witness against himself" contrary to the commands of the Fifth and Fourteenth Amendments because the notice-of-alibi rule required him to give the State the name and address of Mrs. Scotty in advance of trial and thus to furnish the State with information useful in convicting him. No pretrial statement of petitioner was introduced at trial; but armed with Mrs. Scotty's name and address and the knowledge

---

[11] In addition to Florida, at least 15 States appear to have alibi-notice requirements of one sort or another. See Ariz. Rule Crim. Proc. 192 B (1956); Ind. Ann. Stat. §§ 9–1631 to 9–1633 (1956); Iowa Code § 777.18 (1966); Kan. Stat. Ann. § 62–1341 (1964); Mich. Comp. Laws §§ 768.20, 768.21 (1948); Minn. Stat. § 630.14 (1967); N. J. Rule 3:5–9 (1958); N. Y. Code Crim. Proc. § 295–*l* (1958); Ohio Rev. Code Ann. § 2945.58 (1954); Okla. Stat., Tit. 22, § 585 (1969); Pa. Rule Crim. Proc. 312 (1970); S. D. Comp. Laws §§ 23–37–5, 23–37–6 (1967); Utah Code Ann. § 77–22–17 (1953); Vt. Stat. Ann., Tit. 13, §§ 6561, 6562 (1959); Wis. Stat. § 955.07 (1961). See generally 6 J. Wigmore, Evidence § 1855*b* (3d ed. 1940).

We do not, of course, decide that each of these alibi-notice provisions is necessarily valid in all respects; that conclusion must await a specific context and an inquiry, for example, into whether the defendant enjoys reciprocal discovery against the State.

[12] See, *e. g.,* Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash. U. L. Q. 279, 292.

that she was to be petitioner's alibi witness, the State was able to take her deposition in advance of trial and to find rebuttal testimony. Also, requiring him to reveal the elements of his defense is claimed to have interfered with his right to wait until after the State had presented its case to decide how to defend against it. We conclude, however, as has apparently every other court that has considered the issue,[13] that the privilege against self-incrimination is not violated by a requirement that the defendant give notice of an alibi defense and disclose his alibi witnesses.[14]

. The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction. When he presents his witnesses, he must reveal their identity and submit them to cross-examination which in itself may prove incriminating or which may furnish the State with leads to

---

[13] *E. g., State* v. *Stump,* 254 Iowa 1181, 119 N. W. 2d 210, cert. denied, 375 U. S. 853 (1963); *State* v. *Baldwin,* 47 N. J. 379, 221 A. 2d 199, cert. denied, 385 U. S. 980 (1966); *People* v. *Rakiec,* 260 App. Div. 452, 457–458, 23 N. Y. S. 2d 607, 612–613 (1940); *Commonwealth* v. *Vecchiolli,* 208 Pa. Super. 483, 224 A. 2d 96 (1966); see *Jones* v. *Superior Court,* 58 Cal. 2d 56, 372 P. 2d 919 (1962); Louisell, Criminal Discovery and Self-Incrimination: Roger Traynor Confronts the Dilemma, 53 Calif. L. Rev. 89 (1965); Traynor, Ground Lost and Found in Criminal Discovery, 39 N. Y. U. L. Rev. 228 (1964); Comment, The Self-Incrimination Privilege: Barrier to Criminal Discovery?, 51 Calif. L. Rev. 135 (1963); 76 Harv. L. Rev. 838 (1963).

[14] We emphasize that this case does not involve the question of the validity of the threatened sanction, had petitioner chosen not to comply with the notice-of-alibi rule. Whether and to what extent a State can enforce discovery rules against a defendant who fails to comply, by excluding relevant, probative evidence is a question raising Sixth Amendment issues which we have no occasion to explore. Cf. Brief for *Amicus Curiae* 17–26. It is enough that no such penalty was exacted here.

incriminating rebuttal evidence. That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination. The pressures generated by the State's evidence may be severe but they do not vitiate the defendant's choice to present an alibi defense and witnesses to prove it, even though the attempted defense ends in catastrophe for the defendant. However "testimonial" or "incriminating" the alibi defense proves to be, it cannot be considered "compelled" within the meaning of the Fifth and Fourteenth Amendments.

Very similar constraints operate on the defendant when the State requires pretrial notice of alibi and the naming of alibi witnesses. Nothing in such a rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice.[15] That choice must

---

[15] Petitioner's apparent suggestion to the contrary is simply not borne out by the facts of this case. The mere requirement that petitioner disclose in advance his intent to rely on an alibi in no way "fixed" his defense as of that point in time. The suggestion that the State, by referring to petitioner's proposed alibi in opening or closing statements might have "compelled" him to follow through with the defense in order to avoid an unfavorable inference is a hypothetical totally without support in this record. The first reference to the alibi came from petitioner's own attorney in his opening remarks; the State's response did not come until after the defense had finished direct examination of Mrs. Scotty. Petitioner appears to raise this issue as a possible defect in alibi-notice requirements in general, without seriously suggesting that his choice of defense at trial in this case would have been different but for his prior compliance with the rule. Indeed, in his Motion for a Protective Order, petitioner freely disclosed his intent to rely on an alibi; his only objection was to the further requirement that he disclose the nature of the alibi and the name of the witness. On these facts, then, we simply are not confronted with the question

be made, but the pressures that bear on his pretrial decision are of the same nature as those that would induce him to call alibi witnesses at the trial: the force of historical fact beyond both his and the State's control and the strength of the State's case built on these facts. Response to that kind of pressure by offering evidence or testimony is not compelled self-incrimination transgressing the Fifth and Fourteenth Amendments.

In the case before us, the notice-of-alibi rule by itself in no way affected petitioner's crucial decision to call alibi witnesses or added to the legitimate pressures leading to that course of action. At most, the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that the petitioner from the beginning planned to divulge at trial. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself.

Petitioner concedes that absent the notice-of-alibi rule the Constitution would raise no bar to the court's granting the State a continuance at trial on the ground of surprise as soon as the alibi witness is called.[16] Nor

---

of whether a defendant can be compelled in advance of trial to select a defense from which he can no longer deviate. We do not mean to suggest, though, that such a procedure must necessarily raise serious constitutional problems. See *State ex rel. Simos* v. *Burke*, 41 Wis. 2d 129, 137, 163 N. W. 2d 177, 181 (1968) ("[i]f we are discussing the right of a defendant to defer until the moment of his testifying the election between alternative and inconsistent alibis, we have left the concept of the trial as a search for truth far behind").

[16] See Reply Brief for Petitioner 2 and n. 1.

would there be self-incrimination problems if, during that continuance, the State was permitted to do precisely what it did here prior to trial: take the deposition of the witness and find rebuttal evidence. But if so utilizing a continuance is permissible under the Fifth and Fourteenth Amendments, then surely the same result may be accomplished through pretrial discovery, as it was here, avoiding the necessity of a disrupted trial.[17] We decline to hold that the privilege against compulsory self-incrimination guarantees the defendant the right to surprise the State with an alibi defense.

## II

In *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), we held that the Fourteenth Amendment guarantees a right to trial by jury in all criminal cases that—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee. Petitioner's trial for robbery on July 3, 1968, clearly falls within the scope of that holding. See *Baldwin* v. *New York, ante,* p. 66; *DeStefano* v. *Woods,* 392 U. S. 631 (1968). The question in this case then is whether the constitutional guarantee of a trial by "jury" necessarily requires trial by exactly 12 persons, rather than some lesser number—in this case six. We hold that the 12-man panel is not a necessary ingredient of "trial by jury," and that respondent's refusal to impanel more than the six members provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth.

We had occasion in *Duncan* v. *Louisiana, supra,* to review briefly the oft-told history of the development

---

[17] It might also be argued that the "testimonial" disclosures protected by the Fifth Amendment include only statements relating to the historical facts of the crime, not statements relating solely to what a defendant proposes to do at trial.

of trial by jury in criminal cases.[18] That history revealed a long tradition attaching great importance to the concept of relying on a body of one's peers to determine guilt or innocence as a safeguard against arbitrary law enforcement. That same history, however, affords little insight into the considerations that gradually led the size of that body to be generally fixed at 12.[19] Some have suggested that the number 12 was fixed upon simply because that was the number of the presentment jury from the hundred, from which the petit jury developed.[20]

---

[18] See *Duncan* v. *Louisiana*, 391 U. S. 145, 151–154 (1968).

[19] In tracing the development of the jury from the time when the jury performed a different, "inquisitory" function, James B. Thayer notes the following:

"In early times the inquisition had no fixed number. In the Frankish empire we are told of 66, 41, 20, 17, 13, 11, 8, 7, 53, 15, and a great variety of other numbers. So also among the Normans it varied much, and 'twelve has not even the place of the prevailing *grundzahl;*' the documents show all sorts of numbers—4, 5, 6, 12, 13–18, 21, 27, 30, and so on. It seems to have been the recognitions under Henry II. that established twelve as the usual number; even then the number was not uniform." The Jury and Its Development, 5 Harv. L. Rev. 295 (1892) (citations omitted).

See J. Thayer, A Preliminary Treatise on Evidence at the Common Law 85 (1898).

Similarly, Professor Scott writes:

"At the beginning of the thirteenth century twelve was indeed the usual but not the invariable number. But by the middle of the fourteenth century the requirement of twelve had probably become definitely fixed. Indeed this number finally came to be regarded with something like superstitious reverence." A. Scott, Fundamentals of Procedure in Actions at Law 75–76 (1922) (footnotes omitted).

[20] 1 W. Holdsworth, A History of English Law 325 (1927); Wells, The Origin of the Petty Jury, 27 L. Q. Rev. 347, 357 (1911). The latter author traces the development of the 12-man petit jury through the following four stages. The first stage saw the development of the presentment jury, made up generally of 12 persons from the hundred, whose function was simply to charge the ac-

Other, less circular but more fanciful reasons for the number 12 have been given, "but they were all brought forward after the number was fixed," [21] and rest on little more than mystical or superstitious insights into the significance of "12." Lord Coke's explanation that the *"number of twelve* is much respected *in holy writ,* as 12 *apostles,* 12 *stones,* 12 *tribes, etc.,"* [22] is typical.[23] In

cused with a crime; the test of his guilt or innocence was by some other means, such as trial by ordeal, battle, or wager of law. In the second stage, the presentment jury began to be asked for its verdict on the guilt or innocence of the person it had accused, and hence began to function as both a petit and a grand jury. In the third stage, "combination juries" were formed to render the verdict in order to broaden the base of representation beyond the local hundred, or borough, to include the county. These juries were formed by adding one or more presentment juries from one or more hundreds, as well as certain officials such as coroners or knights. "These combination juries numbered from twenty-four to eighty-four jurors, and the number became embarrassingly large and unwieldy, and the sense of the personal responsibility of each juror was in danger of being lost." *Id.,* at 356. The obvious fourth step was the creation of a special jury "formed by selecting one or more jurors from each of several of the presentment juries of the hundreds, until the number twelve is reached . . . probably because that was the number of the presentment jury from the hundred. Therefore, just as the presentment jury represented the voice of the hundred in making the accusation, so the jury of 'the country', with the same number, represented the whole county in deciding whether the accused was guilty or not." *Id.,* at 357.

Neither of these authors hazards a guess as to why the presentment jury itself numbered 12.

[21] *Id.,* at 357.

[22] 1 E. Coke, Institutes of the Laws of England *155a (1st Amer. ed. 1812).

[23] Thus John Proffatt in his treatise on jury trials notes that the reasons why the number of the petit jury is 12, are "quaintly given" in Duncombe's Trials per Pais, as follows:

"[T]his number is no less esteemed by our own law than by holy writ. If the twelve apostles on their twelve thrones must

short, while sometime in the 14th century the size of the jury at common law came to be fixed generally at 12,[24] that particular feature of the jury system appears to have been a historical accident, unrelated to the great

try us in our eternal state, good reason hath the law to appoint the number twelve to try us in our temporal. The tribes of Israel were twelve, the patriarchs were twelve, and Solomon's officers were twelve." Trial by Jury 112 n. 4 (1877), quoting G. Duncombe, 1 Trials per Pais 92–93 (8th ed. 1766).

Attempts have also been made to trace the number 12 to early origins on the European Continent, particularly in Scandinavia. See F. Busch, 1 Law and Tactics in Jury Trials § 24 (1959). See generally W. Forsyth, History of Trial by Jury 4 (1852); T. Repp, Trial by Jury (1832). But even as to the continental practice, no better reasons are discovered for the number 12. Thus Proffatt, in discussing the ancient Scandinavian tribunals, comments:

"Twelve was not only the common number throughout Europe, but was the favorite number in every branch of the polity and jurisprudence of the Gothic nations.

"The singular unanimity in the selection of the number twelve to compose certain judicial bodies, is a remarkable fact in the history of many nations. Many have sought to account for this general custom, and some have based it on religious grounds. One of the ancient kings of Wales, Morgan of Gla-Morgan, to whom is accredited the adoption of the trial by jury in A. D. 725, calls it the 'Apostolic Law.' 'For,' said he, 'as Christ and his twelve apostles were finally to judge the world, so human tribunals should be composed of the king and twelve wise men.' " Proffatt, Trial by Jury 11 n. 2 (1877) (citations omitted).

See also 1 L. Pike, A History of Crime in England 122 (1873).

In this connection it is interesting to note the following oath, required of the early 12-man jury:

"Hear this, ye Justices! that I will speak the truth of that which ye shall ask of me on the part of the king, and I will do faithfully to the best of my endeavour. So help me God, and these holy Apostles." W. Forsyth, Trial by Jury 197 (1852).

See Proffatt, *supra*, at 42.

[24] See *supra*, n. 19.

purposes which gave rise to the jury in the first place.[25] The question before us is whether this accidental feature of the jury has been immutably codified into our Constitution.

This Court's earlier decisions have assumed an affirmative answer to this question. The leading case so construing the Sixth Amendment is *Thompson* v. *Utah,* 170 U. S. 343 (1898). There the defendant had been tried and convicted by a 12-man jury for a crime committed in the Territory of Utah. A new trial was granted, but by that time Utah had been admitted as a State. The defendant's new trial proceeded under Utah's Constitution, providing for a jury of only eight members. This Court reversed the resulting conviction, holding that Utah's constitutional provision was an *ex post facto* law as applied to the defendant. In reaching its conclusion, the Court announced that the Sixth Amendment was applicable to the defendant's trial when Utah was a Territory, and that the jury referred to in the Amendment was a jury "constituted, as it was at common law, of twelve persons, neither more nor less." 170 U. S., at 349. Arguably unnecessary for the result,[26]

---

[25] P. Devlin, Trial by Jury 8 (1956); F. Heller, The Sixth Amendment 64 (1951); W. Willoughby, Principles of Judicial Administration 503 (1929); Tamm, The Five-Man Civil Jury: A Proposed Constitutional Amendment, 51 Geo. L. J. 120, 128–130 (1962); Wiehl, The Six Man Jury, 4 Gonzaga L. Rev. 35, 38–39 (1968); see Thayer, *supra,* n. 19, at 89–90; White, Origin and Development of Trial by Jury, 29 Tenn. L. Rev. 8, 15–16, 17 (1959).

[26] At the time of the crime and at the first trial the statutes of the Territory of Utah—wholly apart from the Sixth Amendment—ensured Thompson a 12-man jury. See 170 U. S., at 345. The Court found the *ex post facto* question easy to resolve, once it was assumed that Utah's subsequent constitutional provision deprived Thompson of a right previously guaranteed him by the United States Constitution; the possibility that the same result might

this announcement was supported simply by referring to the Magna Carta,[27] and by quoting passages from treatises which noted—what has already been seen— that at common law the jury did indeed consist of 12. Noticeably absent was any discussion of the essential step in the argument: namely, that every feature of the jury as it existed at common law—whether incidental or essential to that institution—was necessarily included in the Constitution wherever that document referred to a "jury." [28] Subsequent decisions have reaffirmed the

have been reached solely on the basis of the rights formerly accorded Thompson under the territorial statute was hinted at, but was not explicitly considered.

[27] Whether or not the Magna Carta's reference to a judgment by one's peers was a reference to a "jury"—a fact that historians now dispute, see, e. g., 1 F. Pollock & F. Maitland, The History of English Law Before the Time of Edward I, p. 173 n. 3 (2d ed. 1909); Frankfurter & Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv. L. Rev. 917, 922 n. 14 (1926) (criticizing Thompson v. Utah's reliance on the document "long after scholars had exposed this ancient error")— it seems clear that the Great Charter is not authority for fixing the number of the jury at 12. See W. McKechnie, Magna Carta 134– 138, 375–382 (1958); Scott, Trial by Jury and the Reform of Civil Procedure, 31 Harv. L. Rev. 669, 672 (1918).

As the text indicates, the question is not whether the 12-man jury is traced to 1215 or to 1789, but whether that particular feature must be accepted as a *sine qua non* of the jury trial guaranteed by the Constitution. See Heller, *supra*, n. 25, at 64.

[28] The *Thompson* opinion also reasoned that if a jury can be reduced from 12 to eight, then there was nothing to prevent its similarly being reduced to four or two or even zero, thus dispensing with the jury altogether. See 170 U. S., at 353. That bit of "logic," resurrected today in MR. JUSTICE HARLAN's concurring opinion, *post,* at 126, suffers somewhat as soon as one recognizes that he can get off the "slippery slope" before he reaches the bottom. We have no occasion in this case to determine what minimum number can still constitute a "jury," but we do not doubt that six is above that minimum.

announcement in *Thompson,* often in dictum [29] and usually by relying—where there was any discussion of the issue at all—solely on the fact that the common-law jury consisted of 12.[30] See *Patton* v. *United States,* 281 U. S. 276, 288 (1930); [31] *Rassmussen* v. *United States,* 197 U. S. 516, 519 (1905); *Maxwell* v. *Dow,* 176 U. S. 581, 586 (1900).

While "the intent of the Framers" is often an elusive quarry, the relevant constitutional history casts considerable doubt on the easy assumption in our past decisions that if a given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Con-

---

[29] A ruling that the Sixth Amendment refers to a common-law jury was essential to the holding in *Rassmussen* v. *United States,* 197 U. S. 516 (1905), where the Court held invalid a conviction by a six-man jury in Alaska. The ruling was accepted at the Government's concession without discussion or citation; the major focus of the case was on the question whether the Sixth Amendment was applicable to the territory in question at all. See 197 U. S., at 519.

[30] Similarly, cases interpreting the jury trial provisions of the Seventh Amendment generally leap from the fact that the jury possessed a certain feature at common law to the conclusion that that feature must have been preserved by the Amendment's simple reference to trial by "jury." *E. g., Capital Traction Co.* v. *Hof,* 174 U. S. 1, 13–14 (1899); *American Publishing Co.* v. *Fisher,* 166 U. S. 464, 468 (1897). While much of our discussion in this case may be thought to bear equally on the interpretation of the Seventh Amendment's jury trial provisions, we emphasize that the question is not before us; we do not decide whether, for example, additional references to the "common law" that occur in the Seventh Amendment might support a different interpretation. See *infra,* at 97 and n. 44.

[31] The *Patton* opinion furnishes an interesting illustration of the Court's willingness to re-examine earlier assertions about the nature of "jury trial" in almost every respect except the 12-man-jury requirement. *Patton* reaffirmed the 12-man requirement with a simple citation to *Thompson* v. *Utah,* while at the same time discarding as "dictum" the equally dogmatic assertion in *Thompson* that the requirement could not be waived. See 281 U. S., at 293.

stitution. Provisions for jury trial were first placed in the Constitution in Article III's provision that "[t]he Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed."[32] The "very scanty history [of this provision] in the records of the Constitutional Convention"[33] sheds little light either way on the intended correlation between Article III's "jury" and the features of the jury at common law.[34] Indeed, pending and after the adoption of the Constitution, fears were expressed that Article III's provision failed to preserve the common-law right to be tried by a "jury of the vicinage."[35] That concern, as well as the concern

[32] U. S. Const., Art. III, § 2, cl. 3.

[33] Frankfurter & Corcoran, *supra,* n. 27, at 969.

[34] The only attention given the jury trial provisions involved such questions as whether the right should also be extended to civil cases, see Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289, 292–294 (1966), whether the wording should embrace the "trial of all crimes" or the "trial of all criminal offenses," see Frankfurter & Corcoran, *supra,* n. 27, at 969, and how to provide for the trial of crimes not committed in any State, *id.,* at 969 n. 244. See 2 M. Farrand, Records of the Federal Convention 144, 173, 187, 433, 438, 576, 587–588, 601, 628 (1911). See also 4 *id.,* at 121 (1937) (indexing all references to Art. III, § 2, cl. 3 in Farrand's records).

[35] See Heller, *supra,* n. 25, at 31–33, 93; Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L. Rev. 49, 105 (1923). Technically, "vicinage" means neighborhood, and "vicinage of the jury" meant jury of the neighborhood or, in medieval England, jury of the county. See 4 W. Blackstone, Commentaries *350–351. While Article III provided for venue, it did not impose the explicit juror-residence requirement associated with the concept of "vicinage." See *Maryland* v. *Brown,* 295 F. Supp. 63, 80 (1969). In the Virginia Convention, Madison conceded that the omission was deliberate and defended it as follows:

"It was objected yesterday, that there was no provision for a jury from the vicinage. If it could have been done with safety, it would

to preserve the right to jury in civil as well as criminal cases, furnished part of the impetus for introducing amendments to the Constitution that ultimately resulted in the jury trial provisions of the Sixth and Seventh Amendments. As introduced by James Madison in the House, the Amendment relating to jury trial in criminal cases would have provided that:

> "The trial of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites . . . ." [36]

The Amendment passed the House in substantially this form, but after more than a week of debate in the Senate it returned to the House considerably altered.[37] While records of the actual debates that occurred in

---

not have been opposed. It might so happen that a trial would be impracticable in the county. Suppose a rebellion in a whole district, would it not be impossible to get a jury? The trial by jury is held as sacred in England as in America. There are deviations of it in England: yet greater deviations have happened here since we established our independence, than have taken place there for a long time, though it be left to the legislative discretion. It is a misfortune in any case that this trial should be departed from, yet in some cases it is necessary. It must be therefore left to the discretion of the legislature to modify it according to circumstances. This is a complete and satisfactory answer." 3 M. Farrand, Records of the Federal Convention 332 (1911).

[36] 1 Annals of Cong. 435 (1789).

[37] The Senate Journal indicates that every clause in the House version of the proposed Amendment was deleted except the clause relating to grand jury indictment. Senate Journal, Sept. 4, 1789, 1st Cong., 1st Sess., 71. A subsequent motion to restore the words providing for trial "by an impartial jury of the vicinage, with the requisite of unanimity for conviction, the right of challenge, and other accustomed requisites" failed of adoption. Senate Journal, Sept. 9, 1789, 1st Cong., 1st Sess., 77.

the Senate are not available,[38] a letter from Madison to Edmund Pendleton on September 14, 1789, indicates that one of the Senate's major objections was to the "vicinage" requirement in the House version.[39] A conference committee was appointed. As reported in a second letter by Madison on September 23, 1789, the Senate remained opposed to the vicinage requirement, partly because in its view the then-pending judiciary bill—which was debated at the same time as the Amendments—adequately preserved the common-law vicinage feature, making it unnecessary to freeze that requirement into the Constitution. "The Senate," wrote Madison:

> "are . . . inflexible in opposing a definition of the *locality* of Juries. The vicinage they contend is either too vague or too strict a term; too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the county. It was proposed to insert after the word Juries, 'with the accustomed requisites,' leaving the definition to be construed according to the judgment of professional

---

[38] The principal source of information on the proceedings of the Senate in the First Congress is the Journal of Senator Maclay of Pennsylvania, who unfortunately was ill during the Senate debate on the amendments. See Journal of William Maclay 144–151 (1927); Heller, *supra,* n. 25, at 31–32.

[39] Madison writes:

"The Senate have sent back the plan of amendments with some alterations, which strike, in my opinion, at the most salutary articles. In many of the States, juries, even in criminal cases, are taken from the State at large; in others, from districts of considerable extent; in very few from the County alone. Hence a dislike to the restraint with respect to *vicinage,* which has produced a negative on that clause. . . . Several others have had a similar fate." Letter from James Madison to Edmund Pendleton, Sept. 14, 1789, in 1 Letters and Other Writings of James Madison 491 (1865).

men. Even this could not be obtained. . . . The Senate suppose, also, that the provision for vicinage in the Judiciary bill will sufficiently quiet the fears which called for an amendment on this point." [40]

The version that finally emerged from the Committee was the version that ultimately became the Sixth Amendment, ensuring an accused:

"the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."

Gone were the provisions spelling out such common-law features of the jury as "unanimity," or "the accustomed requisites." And the "vicinage" requirement itself had been replaced by wording that reflected a compromise between broad and narrow definitions of that term, and that left Congress the power to determine the actual size of the "vicinage" by its creation of judicial districts.[41]

Three significant features may be observed in this sketch of the background of the Constitution's jury trial provisions. First, even though the vicinage requirement was as much a feature of the common-law jury as was the 12-man requirement,[42] the mere reference to "trial by jury" in Article III was not interpreted to include that feature. Indeed, as the subsequent debates over the Amendments indicate, disagreement arose over whether the feature should be included at all in its common-law sense, resulting in the compromise described above. Second, provisions that would have explicitly

---

[40] Letter from James Madison to Edmund Pendleton, Sept. 23, 1789, in *id.*, at 492–493. See generally Heller, *supra*, n. 25, at 28–34; Warren, *supra*, n. 35, at 118–132.

[41] See Heller, *supra*, n. 25, at 93.

[42] Proffatt, *supra*, n. 23, at 119; 1 G. Curtis, History of the Origin, Formation, and Adoption of the Constitution of the United States 23 (1863).

tied the "jury" concept to the "accustomed requisites" of the time were eliminated. Such action is concededly open to the explanation that the "accustomed requisites" were thought to be already included in the concept of a "jury." But that explanation is no more plausible than the contrary one: that the deletion had some substantive effect. Indeed, given the clear expectation that a substantive change would be effected by the inclusion or deletion of an explicit "vicinage" requirement, the latter explanation is, if anything, the more plausible. Finally, contemporary legislative and constitutional provisions indicate that where Congress wanted to leave no doubt that it was incorporating existing common-law features of the jury system, it knew how to use express language to that effect. Thus, the Judiciary bill, signed by the President on the same day that the House and Senate finally agreed on the form of the Amendments to be submitted to the States, provided in certain cases for the narrower "vicinage" requirements that the House had wanted to include in the Amendments.[43] And the Seventh Amendment, providing for jury trial in civil cases, explicitly added that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." [44]

---

[43] The Act provided in § 29:

"That in cases punishable with death, the trial shall be had in the county where the offence was committed, or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence." Act of Sept. 24, 1789, § 29, 1 Stat. 88.

[44] Similarly, the First Continental Congress resolved in October 1774:

"That the respective colonies are entitled *to the common law of England,* and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, *according to the course of that law."* 1 Journals of the Continental Congress 69 (C. Ford ed. 1904) (emphasis added). And the Northwest Ordi-

We do not pretend to be able to divine precisely what the word "jury" imported to the Framers, the First Congress, or the States in 1789. It may well be that the usual expectation was that the jury would consist of 12,[45] and that hence, the most likely con-

---

nance of 1787 declared that the inhabitants of that Territory should "always be entitled to the benefits of the writs of *habeas corpus,* and of the trial by jury . . . and of judicial proceedings *according to the course of the common law."* Ordinance of 1787, Art. II, 1 U. S. C. xxxviii (emphasis added). See *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 5–8 (1899) (concluding from these sources that the explicit reference to the "common law" in the Seventh Amendment, referred to the rules of the common law of England, not the rules as modified by local or state practice).

[45] One scholar, however, in investigating the reception of the English common law by the early American colonies, notes that the process:

"was not so simple as the legal theory would lead us to assume. While their general legal conceptions were conditioned by, and their terminology derived from, the common law, the early colonists were far from applying it as a technical system, they often ignored it or denied its subsidiary force, and they consciously departed from many of its most essential principles." Reinsch, The English Common Law in the Early American Colonies, in 1 Select Essays in Anglo-American Legal History 367, 415 (1907).

With respect to the jury trial in particular, while most of the colonies adopted the institution in its English form at an early date, more than one appears to have accepted the institution at various stages only with "various modifications." See *id.,* at 412. Thus Connecticut permitted majority decision in case of continued failure to agree, *id.,* at 386, Virginia expressed regret at being unable to retain the "vicinage" requirement of the English jury, *id.,* at 405, Pennsylvania permitted majority verdicts and employed juries of six or seven, *id.,* at 398, and the Carolinas discontinued the unanimity requirement, 5 F. Thorpe, Federal and State Constitutions 2781 (1909) (Art. 69, "Fundamental Constitutions of Carolina"). See also Heller, *supra,* n. 25, at 13–21.

The States that had adopted Constitutions by the time of the Philadelphia Convention in 1787 appear for the most part to have either explicitly provided that the jury would consist of 12, see Va. Const. of 1776, § 8, in 7 F. Thorpe, Federal and State Constitutions

clusion to be drawn is simply that little thought was actually given to the specific question we face today. But there is absolutely no indication in "the intent of the Framers" of an explicit decision to equate the constitutional and common-law characteristics of the jury. Nothing in this history suggests, then, that we do violence to the letter of the Constitution by turning to other than purely historical considerations to determine which features of the jury system, as it existed at common law, were preserved in the Constitution. The relevant inquiry, as we see it, must be the function that the particular feature performs and its relation to the

3813 (1909), or to have subsequently interpreted their jury trial provisions to include that requirement. In at least one instance involving conviction by eight jurors, a subsequent South Carolina decision interpreting the provision for trial by "jury," refused to declare the 12-man requirement an essential feature of that institution, immune from change by the legislature. See *State* v. *Starling,* 15 Rich. 120, 134 (S. C. Ct. of Errors 1867). The conviction was affirmed without deciding the question, since the State had by that time adopted a Constitution specifically empowering the legislature to determine the number of jurors in certain inferior courts. South Carolina remains today one of apparently five States, including Florida, that provide for juries of less than 12 in felony cases where imprisonment for more than one year may be imposed. See La. Const., Art. 7, § 41; La. Crim. Proc. Code Ann., Art. 779 (Supp. 1969); S. C. Const., Art. 1, §§ 18, 25; Art. 5, § 22; S. C. Code Ann. §§ 15–618, 15–612 (1962); Tex. Const., Art. 1, §§ 10, 15; Art. 5, § 17; Tex. Code Crim. Proc., Arts. 4.07, 37.02 (1966); Tex. Pen. Code, Art. 1148 (1961); Utah Const., Art. 1, §§ 10, 12; Utah Code Ann. § 78–46–5 (1953).

In addition, it appears that at least nine States presently provide for less than 12-man juries in trials of certain offenses carrying maximum penalties of one year's imprisonment. See Brief for Appellee A13–A15, *Baldwin* v. *New York, ante,* p. 66 (collecting statutory provisions). See also 17 Mass. L. Q. No. 4, p. 12 (1932) (noting States that have interpreted the "right of trial by jury" to permit trial by less than 12 in certain cases). For a "poll of state practice," see MR. JUSTICE HARLAN's concurring opinion, *post,* at 122, 136–137, and App.

purposes of the jury trial. Measured by this standard, the 12-man requirement cannot be regarded as an indispensable component of the Sixth Amendment.

The purpose of the jury trial, as we noted in *Duncan*, is to prevent oppression by the Government. "Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan* v. *Louisiana*, *supra*, at 156. Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. The performance of this role is not a function of the particular number of the body that makes up the jury. To be sure, the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community. But we find little reason to think that these goals are in any meaningful sense less likely to be achieved when the jury numbers six, than when it numbers 12—particularly if the requirement of unanimity is retained.[46] And, certainly the reliability of the jury

---

[46] We intimate no view whether or not the requirement of unanimity is an indispensable element of the Sixth Amendment jury trial. While much of the above historical discussion applies as well to the unanimity as to the 12-man requirement, the former, unlike the latter, may well serve an important role in the jury function, for example, as a device for insuring that the Government bear the heavier burden of proof. See *Hibdon* v. *United States*, 204 F. 2d 834, 838 (C. A. 6th Cir. 1953); Tamm, *supra*, n. 25, at 139. But cf. Comment, Waiver of Jury Unanimity—Some Doubts About Reasonable Doubt, 21 U. Chi. L. Rev. 438, 441–443

as a factfinder hardly seems likely to be a function of its size.

It might be suggested that the 12-man jury gives a defendant a greater advantage since he has more "chances" of finding a juror who will insist on acquittal and thus prevent conviction. But the advantage might just as easily belong to the State, which also needs only one juror out of twelve insisting on guilt to prevent acquittal.[47] What few experiments have occurred—usually in the civil area—indicate that there is no discernible difference between the results reached by the two different-sized juries.[48] In short, neither currently available evidence nor theory[49] suggests that the 12-man

(1954). See generally American Bar Association Project on Standards for Criminal Justice, Trial by Jury 42–45 (Approved Draft 1968).

[47] It is true, of course, that the "hung jury" might be thought to result in a minimal advantage for the defendant, who remains unconvicted and who enjoys the prospect that the prosecution will eventually be dropped if subsequent juries also "hang." Thus a 100-man jury would undoubtedly be more favorable for defendants than a 12-man jury. But when the comparison is between 12 and six, the odds of continually "hanging" the jury seem slight, and the numerical difference in the number needed to convict seems unlikely to inure perceptibly to the advantage of either side.

[48] See Wiehl, *supra,* n. 25, at 40–41; Tamm, *supra,* n. 25, at 134–136; Cronin, Six-Member Juries in District Courts, 2 Boston B. J. No. 4, p. 27 (1958); Six-Member Juries Tried in Massachusetts District Court, 42 J. Am. Jud. Soc. 136 (1958). See also New Jersey Experiments with Six-Man Jury, 9 Bull. of the Section of Jud. Admin. of the ABA (May 1966); Phillips, A Jury of Six in All Cases, 30 Conn. B. J. 354 (1956).

[49] Studies of the operative factors contributing to small group deliberation and decisionmaking suggest that jurors in the minority on the first ballot are likely to be influenced by the proportional size of the majority aligned against them. See H. Kalven & H. Zeisel, The American Jury 462–463, 488–489 (1966); C. Hawkins, Interaction and Coalition Realignments in Consensus-Seeking Groups: A Study of Experimental Jury Deliberations 13, 146, 156, Aug. 17,

jury is necessarily more advantageous to the defendant than a jury composed of fewer members.

Similarly, while in theory the number of viewpoints represented on a randomly selected jury ought to increase as the size of the jury increases, in practice the difference between the 12-man and the six-man jury in terms of the cross-section of the community represented seems likely to be negligible. Even the 12-man jury cannot insure representation of every distinct voice in the community, particularly given the use of the peremptory challenge. As long as arbitrary exclusions of a particular class from the jury rolls are forbidden, see, *e. g., Carter* v. *Jury Commission,* 396 U. S. 320, 329–330 (1970), the concern that the cross-section will be significantly diminished if the jury is decreased in size from 12 to six seems an unrealistic one.

We conclude, in short, as we began: the fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance "except to mystics." *Duncan* v. *Louisiana, supra,* at 182 (HARLAN, J., dissenting). To read the Sixth Amendment as

1960 (unpublished thesis on file at Library of Congress); cf. Asch, Effects of Group Pressure Upon the Modification and Distortion of Judgments, in Readings in Social Psychology 2 (G. Swanson, T. Newcomb & E. Hartley et al., eds., 1952). See generally Note, On Instructing Deadlocked Juries, 78 Yale L. J. 100, 108 and n. 30 (and authorities cited), 110–111 (1968). Thus if a defendant needs initially to persuade four jurors that the State has not met its burden of proof in order to escape ultimate conviction by a 12-man jury, he arguably escapes by initially persuading half that number in a six-man jury; random reduction, within limits, of the absolute number of the jury would not affect the outcome. See also C. Joiner, Civil Justice and the Jury 31, 83 (1962) (concluding that the deliberative process should be the same in either the six- or 12-man jury).

forever codifying a feature so incidental to the real purpose of the Amendment is to ascribe a blind formalism to the Framers which would require considerably more evidence than we have been able to discover in the history and language of the Constitution or in the reasoning of our past decisions. We do not mean to intimate that legislatures can never have good reasons for concluding that the 12-man jury is preferable to the smaller jury, or that such conclusions—reflected in the provisions of most States and in our federal system[50]— are in any sense unwise. Legislatures may well have their own views about the relative value of the larger and smaller juries, and may conclude that, wholly apart from the jury's primary function, it is desirable to spread the collective responsibility for the determination of guilt among the larger group. In capital cases, for example, it appears that no State provides for less than 12 jurors— a fact that suggests implicit recognition of the value of the larger body as a means of legitimating society's decision to impose the death penalty. Our holding does no more than leave these considerations to Congress and the States, unrestrained by an interpretation of the Sixth Amendment that would forever dictate the precise number that can constitute a jury. Consistent with this holding, we conclude that petitioner's Sixth Amendment rights, as applied to the States through the Fourteenth Amendment, were not violated by Florida's decision to provide a six-man rather than a 12-man jury. The judgment of the Florida District Court of Appeal is

*Affirmed.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

---

[50] See Fed. Rule Crim. Proc. 23 (b) ("[j]uries shall be of 12").

APPENDIX TO OPINION OF THE COURT

Fla. Rule Crim. Proc. 1.200:

"Upon the written demand of the prosecuting attorney, specifying as particularly as is known to such prosecuting attorney, the place, date and time of the commission of the crime charged, a defendant in a criminal case who intends to offer evidence of an alibi in his defense shall, not less than ten days before trial or such other time as the court may direct, file and serve upon such prosecuting attorney a notice in writing of his intention to claim such alibi, which notice shall contain specific information as to the place at which the defendant claims to have been at the time of the alleged offense and, as particularly as is known to defendant or his attorney, the names and addresses of the witnesses by whom he proposes to establish such alibi. Not less than five days after receipt of defendant's witness list, or such other times as the court may direct, the prosecuting attorney shall file and serve upon the defendant the names and addresses (as particularly as are known to the prosecuting attorney) of the witnesses the State proposes to offer in rebuttal to discredit the defendant's alibi at the trial of the cause. Both the defendant and the prosecuting attorney shall be under a continuing duty to promptly disclose the names and addresses of additional witnesses which come to the attention of either party subsequent to filing their respective witness lists as provided in this rule. If a defendant fails to file and serve a copy of such notice as herein required, the court may exclude evidence offered by such defendant for the purpose of proving an alibi, except the testimony of the defendant himself. If such notice is given by a

defendant, the court may exclude the testimony of any witness offered by the defendant for the purpose of proving an alibi if the name and address of such witness as particularly as is known to defendant or his attorney is not stated in such notice. If the prosecuting attorney fails to file and serve a copy on the defendant of a list of witnesses as herein provided, the court may exclude evidence offered by the state in rebuttal to the defendant's alibi evidence. If such notice is given by the prosecuting attorney, the court may exclude the testimony of any witness offered by the prosecuting attorney for the purpose of rebutting the defense of alibi if the name and address of such witness as particularly as is known to the prosecuting attorney is not stated in such notice. For good cause shown the court may waive the requirements of this rule."

MR. CHIEF JUSTICE BURGER, concurring.

I join fully in MR. JUSTICE WHITE's opinion for the Court. I see an added benefit to the notice-of-alibi rule in that it will serve important functions by way of disposing of cases without trial in appropriate circumstances—a matter of considerable importance when courts, prosecution offices, and legal aid and defender agencies are vastly overworked. The prosecutor upon receiving notice will, of course, investigate prospective alibi witnesses. If he finds them reliable and unimpeachable he will doubtless re-examine his entire case and this process would very likely lead to dismissal of the charges. In turn he might be obliged to determine why false charges were instituted and where the breakdown occurred in the examination of evidence that led to a charge.

On the other hand, inquiry into a claimed alibi defense may reveal it to be contrived and fabricated and the

witnesses accordingly subject to impeachment or other attack. In this situation defense counsel would be obliged to re-examine his case and, if he found his client has proposed the use of false testimony, either seek to withdraw from the case or try to persuade his client to enter a plea of guilty, possibly by plea discussions which could lead to disposition on a lesser charge.

In either case the ends of justice will have been served and the processes expedited. These are the likely consequences of an enlarged and truly reciprocal pretrial disclosure of evidence and the move away from the "sporting contest" idea of criminal justice.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring in part and dissenting in part.

The Court today holds that a State can, consistently with the Sixth Amendment to the United States Constitution, try a defendant in a criminal case with a jury of six members. I agree with that decision for substantially the same reasons given by the Court. My Brother HARLAN, however, charges that the Court's decision on this point is evidence that the "incorporation doctrine," through which the specific provisions of the Bill of Rights are made fully applicable to the States under the same standards applied in federal courts [1] will somehow result in a "dilution" of the protections required by those provisions. He asserts that this Court's desire to relieve the States from the rigorous requirements of the Bill of Rights is bound to cause re-examination and modification of prior decisions interpreting those provisions as applied in federal courts in order simultaneously to apply the provisions equally to the State and Federal Governments and to avoid undue restrictions on the States. This assertion finds no support in today's decision or any

---

[1] See cases cited in *In re Winship*, 397 U. S. 358, 382 n. 11 (1970) (BLACK, J., dissenting).

other decision of this Court. We have emphatically "rejected the notion that the Fourteenth Amendment applies to the States only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights.'" *Malloy* v. *Hogan,* 378 U. S. 1, 10–11 (1964). Today's decision is in no way attributable to any desire to dilute the Sixth Amendment in order more easily to apply it to the States, but follows solely as a necessary consequence of our duty to re-examine prior decisions to reach the correct constitutional meaning in each case. The broad implications in early cases indicating that only a body of 12 members could satisfy the Sixth Amendment requirement arose in situations where the issue was not squarely presented and were based, in my opinion, on an improper interpretation of that amendment. Had the question presented here arisen in a federal court before our decision in *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), this Court would still, in my view, have reached the result announced today. In my opinion the danger of diluting the Bill of Rights protections lies not in the "incorporation doctrine," but in the "shock the conscience" test on which my Brother HARLAN would rely instead—a test which depends, not on the language of the Constitution, but solely on the views of a majority of the Court as to what is "fair" and "decent."

The Court also holds that a State can require a defendant in a criminal case to disclose in advance of trial the nature of his alibi defense and give the names and addresses of witnesses he will call to support that defense. This requirement, the majority says, does not violate the Fifth Amendment prohibition against compelling a criminal defendant to be a witness against himself. Although this case itself involves only a notice-of-alibi provision, it is clear that the decision means that a State can require a defendant to disclose in advance of trial any

and all information he might possibly use to defend himself at trial. This decision, in my view, is a radical and dangerous departure from the historical and constitutionally guaranteed right of a defendant in a criminal case to remain completely silent, requiring the State to prove its case without any assistance of any kind from the defendant himself.

I

The core of the majority's decision is an assumption that compelling a defendant to give notice of an alibi defense before a trial is no different from requiring a defendant, after the State has produced the evidence against him at trial, to plead alibi before the jury retires to consider the case. This assumption is clearly revealed by the statement that "the pressures that bear on [a defendant's] pre-trial decision are of the same nature as those that would induce him to call alibi witnesses at the trial: the force of historical fact beyond both his and the State's control and the strength of the State's case built on these facts." *Ante,* at 85. That statement is plainly and simply wrong as a matter of fact and law, and the Court's holding based on that statement is a complete misunderstanding of the protections provided for criminal defendants by the Fifth Amendment and other provisions of the Bill of Rights.[2]

---

[2] As I have frequently stated, in my opinion the Fourteenth Amendment was in part adopted in order to make the provisions of the Bill of Rights fully applicable to the States. See, *e. g., Adamson* v. *California,* 332 U. S. 46, 68 (1947) (dissenting opinion). This Court has now held almost all these provisions do apply to the States as well as the Federal Government, including the Fifth Amendment provision involved in this case. See *Malloy* v. *Hogan,* 378 U. S. 1 (1964); cases cited in *In re Winship,* 397 U. S. 358, 382 n. 11 (1970) (BLACK, J., dissenting). When this Court is called upon to consider the meaning of a particular provision of the Bill of Rights—whether in a case arising from a state court or a

## A

When a defendant is required to indicate whether he might plead alibi in advance of trial, he faces a vastly different decision from that faced by one who can wait until the State has presented the case against him before making up his mind. Before trial the defendant knows only what the State's case *might* be. Before trial there is no such thing as the "strength of the State's case"; there is only a range of possible cases. At that time there is no certainty as to what kind of case the State will ultimately be able to prove at trial. Therefore any appraisal of the desirability of pleading alibi will be beset with guesswork and gambling far greater than that accompanying the decision at the trial itself. Any lawyer who has actually tried a case knows that, regardless of the amount of pretrial preparation, a case looks far different when it is actually being tried than when it is only being thought about.

The Florida system, as interpreted by the majority, plays upon this inherent uncertainty in predicting the possible strength of the State's case in order effectively to coerce defendants into disclosing an alibi defense that may never be actually used. Under the Florida rule, a defendant who might plead alibi must, at least 10 days before the date of trial, tell the prosecuting attorney that he might claim an alibi or else the defendant faces the real threat that he may be completely barred

---

federal one—it is necessary to look to the specific language of the provision and the intent of the Framers when the Bill of Rights itself was adopted. This approach is necessary, not because the Framers intended the Bill of Rights to apply to the States when it was proposed in 1789, but because the application of those provisions to the States by the Fourteenth Amendment requires that the original intent be the governing consideration in state as well as federal cases.

from presenting witnesses in support of his alibi. According to the Court, however, if he gives the required notice and later changes his mind "[n]othing in such a rule requires [him] to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice." *Ante,* at 84. Thus in most situations defendants with any possible thought of pleading alibi are in effect compelled to disclose their intentions in order to preserve the possibility of later raising the defense at trial. Necessarily few defendants and their lawyers will be willing to risk the loss of that possibility by not disclosing the alibi. Clearly the pressures on defendants to plead an alibi created by this procedure are not only quite different from the pressures operating at the trial itself, but are in fact significantly greater. Contrary to the majority's assertion, the pretrial decision cannot be analyzed as simply a matter of "timing," influenced by the same factors operating at the trial itself.

The Court apparently also assumes that a defendant who has given the required notice can abandon his alibi without hurting himself. Such an assumption is implicit in and necessary for the majority's argument that the pretrial decision is no different from that at the trial itself. I, however, cannot so lightly assume that pretrial notice will have no adverse effects on a defendant who later decides to forgo such a defense. Necessarily the defendant will have given the prosecutor the names of persons who may have some knowledge about the defendant himself or his activities. Necessarily the prosecutor will have every incentive to question these persons fully, and in doing so he may discover new leads or evidence. Undoubtedly there will be situations in which the State will seek to use such information—information it would probably never have obtained but for the defendant's coerced cooperation.

## B

It is unnecessary for me, however, to engage in any such intellectual gymnastics concerning the practical effects of the notice-of-alibi procedure, because the Fifth Amendment itself clearly provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." If words are to be given their plain and obvious meaning, that provision, in my opinion, states that a criminal defendant cannot be required to give evidence, testimony, or any other assistance to the State to aid it in convicting him of crime. Cf. *Schmerber* v. *California*, 384 U. S. 757, 773 (1966) (BLACK, J., dissenting). The Florida notice-of-alibi rule in my opinion is a patent violation of that constitutional provision because it requires a defendant to disclose information to the State so that the State can use that information to destroy him. It seems to me at least slightly incredible to suggest that this procedure may have some beneficial effects for defendants. There is no need to encourage defendants to take actions they think will help them. The fear of conviction and the substantial cost or inconvenience resulting from criminal prosecutions are more than sufficient incentives to make defendants want to help themselves. If a defendant thinks that making disclosure of an alibi before trial is in his best interests, he will obviously do so. And the only time the State needs the compulsion provided by this procedure is when the defendant has decided that such disclosure is likely to hurt his case.

It is no answer to this argument to suggest that the Fifth Amendment as so interpreted would give the defendant an unfair element of surprise, turning a trial into a "poker game" or "sporting contest," for that tactical advantage to the defendant is inherent in the type of trial required by our Bill of Rights. The Framers

were well aware of the awesome investigative and prosecutorial powers of government and it was in order to limit those powers that they spelled out in detail in the Constitution the procedure to be followed in criminal trials. A defendant, they said, is entitled to notice of the charges against him, trial by jury, the right to counsel for his defense, the right to confront and cross-examine witnesses, the right to call witnesses in his own behalf, and the right not to be a witness against himself. All of these rights are designed to shield the defendant against state power. None are designed to make convictions easier and taken together they clearly indicate that in our system the entire burden of proving criminal activity rests on the State. The defendant, under our Constitution, need not do anything at all to defend himself, and certainly he cannot be required to help convict himself. Rather he has an absolute, unqualified right to compel the State to investigate its own case, find its own witnesses, prove its own facts, and convince the jury through its own resources. Throughout the process the defendant has a fundamental right to remain silent, in effect challenging the State at every point to: "Prove it!"

The Bill of Rights thus sets out the type of constitutionally required system that the State must follow in order to convict individuals of crime. That system requires that the State itself must bear the entire burden without any assistance from the defendant. This requirement is clearly indicated in the Fifth Amendment itself, but it is equally apparent when all the specific provisions of the Bill of Rights relating to criminal prosecutions are considered together. And when a question concerning the constitutionality of some aspect of criminal procedure arises, this Court must consider all those provisions and interpret them together. The Fifth Amendment prohibition against compelling a defendant

to be a witness against himself is not an isolated, distinct provision. It is part of a system of constitutionally required procedures, and its true meaning can be seen only in light of all those provisions. "Strict construction" of the words of the Constitution does not mean that the Court can look only to one phrase, clause, or sentence in the Constitution and expect to find the right answer. Each provision has clear and definite meaning, and various provisions considered together may have an equally clear and definite meaning. It is only through sensitive attention to the specific words, the context in which they are used, and the history surrounding the adoption of those provisions that the true meaning of the Constitution can be discerned.

This constitutional right to remain absolutely silent cannot be avoided by superficially attractive analogies to any so-called "compulsion" inherent in the trial itself that may lead a defendant to put on evidence in his own defense. Obviously the Constitution contemplates that a defendant can be "compelled" to stand trial, and obviously there will be times when the trial process itself will require the defendant to do something in order to try to avoid a conviction. But nothing in the Constitution permits the State to add to the natural consequences of a trial and compel the defendant in advance of trial to participate in any way in the State's attempt to condemn him.

A criminal trial is in part a search for truth. But it is also a system designed to protect "freedom" by insuring that no one is criminally punished unless the State has first succeeded in the admittedly difficult task of convincing a jury that the defendant is guilty. That task is made more difficult by the Bill of Rights, and the Fifth Amendment may be one of the most difficult of the barriers to surmount. The Framers decided that the benefits to be derived from the kind of trial required

by the Bill of Rights were well worth any loss in "efficiency" that resulted. Their decision constitutes the final word on the subject, absent some constitutional amendment. That decision should not be set aside as the Court does today.

## II

On the surface this case involves only a notice-of-alibi provision, but in effect the decision opens the way for a profound change in one of the most important traditional safeguards of a criminal defendant. The rationale of today's decision is in no way limited to alibi defenses, or any other type or classification of evidence. The theory advanced goes at least so far as to permit the State to obtain under threat of sanction complete disclosure by the defendant in advance of trial of all evidence, testimony, and tactics he plans to use at that trial. In each case the justification will be that the rule affects only the "timing" of the disclosure, and not the substantive decision itself. This inevitability is clearly revealed by the citation to *Jones* v. *Superior Court,* 58 Cal. 2d 56, 372 P. 2d 919 (1962), *ante,* at 83 n. 13. In that case, the theory of which the Court today adopts in its entirety, a defendant in a rape case disclosed that he would rely in part on a defense of impotency. The prosecutor successfully obtained an order compelling the defendant to reveal the names and addresses of any doctors he consulted and the medical reports of any examinations relating to the claimed incapacity. That order was upheld by the highest court in California. There was no "rule" or statute to support such a decision, only the California Supreme Court's sense of fairness, justice, and judicial efficiency. The majority there found no barrier to the judicial creation of pretrial discovery by the State against the defendant, least of all a barrier raised by any constitutional prohibition on compelling the defendant to be a witness against himself.

The dangerous implications of the *Jones* rationale adopted today are not, however, limited to the disclosure of evidence that the defendant has already decided he will use at trial. In *State* v. *Grove,* 65 Wash. 2d 525, 398 P. 2d 170 (1965), the Washington Supreme Court, relying on *Jones,* held that a defendant in a murder trial could be compelled to produce a letter he had written his wife about the alleged crime, even though he had no thought at all of using that evidence in his own behalf. These cases are sufficient evidence of the inch-by-inch, case-by-case process by which the rationale of today's decision can be used to transform radically our system of criminal justice into a process requiring the defendant to assist the State in convicting him, or be punished for failing to do so.

There is a hint in the State's brief in this case—as well as, I fear, in the Court's opinion—of the ever-recurring suggestion that the test of constitutionality is the test of "fairness," "decency," or in short the Court's own views of what is "best." Occasionally this test emerges in disguise as an intellectually satisfying "distinction" or "analogy" designed to cover up a decision based on the wisdom of a proposed procedure rather than its conformity with the commands of the Constitution. Such a course, in my view, is involved in this case. This decision is one more step away from the written Constitution and a radical departure from the system of criminal justice that has prevailed in this country. Compelling a defendant in a criminal case to be a witness against himself in any way, including the use of the system of pretrial discovery approved today, was unknown in English law, except for the unlamented proceedings in the Star Chamber courts—the type of proceedings the Fifth Amendment was designed to prevent. For practically the first 150 years of this Nation's history no State considered adopting such procedures compelling

a criminal defendant to help convict himself, although history does not indicate that our ancestors were any less intelligent or solicitous of having a fair and efficient system of criminal justice than we are. History does indicate that persons well familiar with the dangers of arbitrary and oppressive use of the criminal process were determined to limit such dangers for the protection of each and every inhabitant of this country. They were well aware that any individual might some day be subjected to criminal prosecution, and it was in order to protect the freedom of *each* of us that they restricted the Government's ability to punish or imprison *any* of us. Yet in spite of the history of oppression that produced the Bill of Rights and the strong reluctance of our governments to compel a criminal defendant to assist in his own conviction, the Court today reaches out to embrace and sanctify at the first opportunity a most dangerous departure from the Constitution and the traditional safeguards afforded persons accused of crime. I cannot accept such a result and must express my most emphatic disagreement and dissent.

MR. JUSTICE MARSHALL, dissenting in part.

I join Part I of the Court's opinion. However, since I believe that the Fourteenth Amendment guaranteed Williams a jury of 12 to pass upon the question of his guilt or innocence before he could be sent to prison for the rest of his life, I dissent from the affirmance of his conviction.

I adhere to the holding of *Duncan* v. *Louisiana,* 391 U. S. 145, 149 (1968), that "[b]ecause . . . trial by jury in criminal cases is fundamental to the American scheme of justice . . . the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." And I agree with

the Court that the *same* "trial by jury" is guaranteed to state defendants by the Fourteenth Amendment as to federal defendants by the Sixth. "Once it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice' . . . the same constitutional standards apply against both the State and Federal Governments." *Benton* v. *Maryland,* 395 U. S. 784, 795 (1969).

At the same time, I adhere to the decision of the Court in *Thompson* v. *Utah,* 170 U. S. 343, 349 (1898), that the jury guaranteed by the Sixth Amendment consists "of twelve persons, neither more nor less." As I see it, the Court has not made out a convincing case that the Sixth Amendment should be read differently than it was in *Thompson* even if the matter were now before us *de novo*—much less that an unbroken line of precedent going back over 70 years should be overruled. The arguments made by MR. JUSTICE HARLAN in Part IB of his opinion persuade me that *Thompson* was right when decided and still states sound doctrine. I am equally convinced that the requirement of 12 should be applied to the States.

MR. JUSTICE HARLAN, dissenting in No. 188, *ante,* p. 66, and concurring in the result in No. 927.

In *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), the Court held, over my dissent, joined by MR. JUSTICE STEWART, that a state criminal defendant is entitled to a jury trial in any case which, if brought in a federal court, would require a jury under the Sixth Amendment. Today the Court concludes, in No. 188, *Baldwin* v. *New York,* that New York cannot constitutionally provide that misdemeanors carrying sentences up to one year shall be tried in New York City without a jury.[1] At

---

[1] Outside of New York City, such cases are triable before six-member juries.

118

the same time the Court holds in No. 927, *Williams* v. *Florida,* that Florida's six-member-jury statute satisfies the Sixth Amendment as carried to the States by the *Duncan* holding.[2] The necessary consequence of this decision is that 12-member juries are not *constitutionally* required in *federal* criminal trials either.

The historical argument by which the Court undertakes to justify its view that the Sixth Amendment does not require 12-member juries is, in my opinion, much too thin to mask the true thrust of this decision. The decision evinces, I think, a recognition that the "incorporationist" view of the Due Process Clause of the Fourteenth Amendment, which underlay *Duncan* and is now carried forward into *Baldwin,* must be tempered to allow the States more elbow room in ordering their own criminal systems. With that much I agree. But to accomplish this by diluting constitutional protections within the federal system itself is something to which I cannot possibly subscribe. Tempering the rigor of *Duncan* should be done forthrightly, by facing up to the fact that at least in this area the "incorporation" doctrine does not fit well with our federal structure, and by the same token that *Duncan* was wrongly decided.

I would sustain both the Florida and New York statutes on the constitutional premises discussed in my dissenting opinion in *Duncan,* 391 U. S., at 161 *et seq.* In taking that course in *Baldwin,* I cannot, in a matter that goes to the very pulse of sound constitutional adjudication, consider myself constricted by *stare decisis.*[3]

---

[2] Florida provides for a jury of 12 in capital cases and a six-member jury "to try all other criminal cases." Fla. Stat. § 913.10 (1) (1967).

[3] As Mr. Justice Frankfurter said, speaking for the Court:

"[S]*tare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence

Accordingly, I dissent in No. 188 and, as to the jury issue, concur in the result in No. 927. Given *Malloy* v. *Hogan,* 378 U. S. 1 (1964), I join that part of the Court's opinion in No. 927 relating to the Florida "alibi" procedure.

## I

As a predicate for my conclusions, it is useful to map the circuitous route that has been taken in order to reach the results. In both cases, more patently in *Williams* than in *Baldwin,* the history of jury trial practice in both the state and federal systems has been indiscriminately jumbled together as opposed to the point of departure having been taken from the language in which the *federal* guarantee is expressed and the historical precedent that brings it to life. The consequence of this inverted approach to interpreting the Sixth Amendment results, fortuitously,[4] in *Baldwin* in a Sixth Amendment rule that would be reached under the correct approach, given the "incorporationist" philosophy of *Duncan,* but, unhappily, imposes it on the one jurisdiction in the country that has seen fit to do otherwise; and in *Williams* results in a Sixth Amendment rule that could only be reached by standing the constitutional dialectic on its head.

## A

To the extent that the prevailing opinion premises its conclusions in the *Baldwin* case on federal precedent and the common-law practice, I agree that the federal right to

---

to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940).

[4] While all States except New York provide for jury trials for crimes carrying sentences of six months or more, there is a good deal of diversity as to the number of jurors and the stage at which the right to jury trial attaches.

jury trial attaches where an offense is punishable by as much as six months' imprisonment. I think this follows both from the breadth of the language of the Sixth Amendment, which provides for a jury in "all criminal prosecutions," and the evidence of historical practice. In this regard I believe that contemporary usage in the States is of little, if any, significance.[5] For if exceptions are to be created out of the all-embracing language of the Sixth Amendment they should only be those that are anchored in history.

It is to the distinction between "petty" and "serious" offenses, rooted in the common law, that this Court has looked to ascertain the metes and bounds of the federal right guaranteed by the Sixth Amendment. See *District of Columbia* v. *Clawans,* 300 U. S. 617 (1937); *Schick* v. *United States,* 195 U. S. 65 (1904); *Callan* v. *Wilson,* 127 U. S. 540, 552 (1888). Since the conventional, if not immutable practice at common law appears to have been to provide juries for offenses punishable by fines of more than £100 or sentences to hard labor of more than six months in prison, see Frankfurter & Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv. L. Rev. 917 (1926),[6] I think it

---

[5] After concluding, relying on this Court's prior decisions, that the jury trial required by the Sixth Amendment applies only to "serious" as opposed to "petty" offenses, the opinion defines those terms by perfunctory reference to history and a survey of prevailing state rules. See No. 188, *ante,* at 71–72.

[6] "The range and severity of punishment in summary trials has been defined by limiting jurisdiction to the imposition of fines up to a hundred pounds and sentences with hard labor up to six months." *Id.,* at 934. The practice in the Colonies was not uniform but it is apparent that the line was drawn at six months in most instances. See *District of Columbia* v. *Clawans, supra,* at 626 nn. 2, 3.

appropriate to draw the line at six months in federal cases,[7] although, for reasons to follow, I would not encumber the States by this requirement.[8]

[7] While this Court has said that the most significant index to the seriousness of an offense is the degree of penalty that attaches, see *Frank* v. *United States,* 395 U. S. 147, 148 (1969); *District of Columbia* v. *Clawans, supra,* it should be recalled that this is not alone determinative and that the "apportioned punishment was both a consequence of the minor quality of the misconduct and an index of the community's moral judgment upon it." Frankfurter & Corcoran, *supra,* at 980. In *Clawans* the Court held the severity of punishment was not determinative when the offense by its own nature is not considered grave. 300 U. S., at 625; see also *Callan* v. *Wilson, supra,* at 556; *Schick* v. *United States, supra,* where this Court noted that the "nature" of the offense and the severity of punishment are two distinct considerations. Cf. the House debate in 1930 over a bill to provide for a trial before federal magistrates for crimes of a petty nature, 72 Cong. Rec. 9991–9994; see also H. R. Rep. No. 1699, 71st Cong., 2d Sess. (1930) (minority views); Comments, American Bar Association Project on Standards for Criminal Justice, Trial by Jury 21 (Approved Draft 1968); Comment, The Petty Offense Category and Trial by Jury, 40 Yale L. J. 1303 (1931). I would reserve the question as to whether a jury would be required in a federal case for a particular offense not punishable by more than six months in prison.

[8] Nor do I think it offends the Equal Protection Clause for New York not to provide juries to hear offenses punishable by six months in New York City but to have such a provision for trials elsewhere in the State. In *Salsburg* v. *Maryland,* 346 U. S. 545 (1954), and *Missouri* v. *Lewis,* 101 U. S. 22 (1880), this Court upheld the right of a State to adapt procedures to the differing requirements of territorial subdivisions. In *Salsburg* the Court quoted and reaffirmed the principles set forth in *Missouri:* " '[T]here is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the

## B

In *Williams* the Court strangely does an about-face. Rather than bind the States by the hitherto undeviating and unquestioned federal practice of 12-member juries, the Court holds, based on a poll of state practice, that a six-man jury satisfies the guarantee of a trial by jury in a federal criminal system and consequently carries over to the States. This is a constitutional *renvoi.* With all respect, I consider that before today it would have been unthinkable to suggest that the Sixth Amendment's right to a trial by jury is satisfied by a jury of six, or less, as is left open by the Court's opinion in *Williams,* or by less than a unanimous verdict, a question also reserved in today's decision.

1. The Court, in stripping off the livery of history from the jury trial, relies on a two-step analysis. With arduous effort the Court first liberates itself from the "intent of the Framers" and "the easy assumption in our past decisions that if a given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Constitution." *Ante,* at 92–93. Unburdened by

Constitution of the United States to prevent its doing so.' " 346 U. S., at 551.

The Court in *Missouri* v. *Lewis* also stated: "Where part of a State is thickly settled, and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions,—trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the State government if it could not, in its discretion, provide for these various exigencies." 101 U. S., at 32. See also *Ohio* v. *Akron Park District,* 281 U. S. 74, 81 (1930); *Ocampo* v. *United States,* 234 U. S. 91, 98–99 (1914).

The disproportionate number of misdemeanor cases that now clog New York City courts, see Part III, *infra,* creates a difference of a magnitude that more than justifies the differences in treatment between city and non-city defendants.

the yoke of history the Court then concludes that the policy protected by the jury guarantee does not require its perpetuation in common-law form.

Neither argument is, in my view, an acceptable reason for disregarding history and numerous pronouncements of this Court that have made "the easy assumption" that the Sixth Amendment's jury was one composed of 12 individuals. Even assuming ambiguity as to the intent of the Framers,[9] it is common sense and not merely the

---

[9] The Court's conclusions from the historical materials, by its own admission, can hardly be characterized as solid. The entire argument seems to flow from the fact that the Senate Committee substituted the present language of the Sixth Amendment for the more specific House version that incorporated the unanimity requirement and expressly tied the jury to "other accustomed requisites." But the meaning of this change is wholly speculative, for, apart from the "vicinage" requirement, there is no concrete evidence cited by the Court to show that the Senate opposed the more likely features of the Madison version adopted by the House. In the context of an amendment notable for its sparseness of language, a more likely explanation of the Senate's action is that it was streamlining the Madison version on the assumption that the most prominent features of the jury would be preserved as a matter of course. This interpretation of the events is supported by the fact that the only specifically objectionable feature of the common-law jury—the vicinage requirement—was pre-empted by language providing for a trial by a jury of the district, thus leaving the remaining attributes undefined in face of the distinct expectation that those charged with interpretation would look to the common law. Nor is this explanation rendered less forceful by the fact, noted by the Court, that "reception" of the common-law jury did not unfailingly mean 12 in early colonial times. As the Court itself acknowledges, the States that had constitutions in 1787 provided for juries of 12. The Court's other arguments—(1) that simple reference to a jury in Article III was not necessarily thought to mean to the Framers a common-law jury in light of the need felt to add the Amendments and Madison's more elaborate proposal for the Sixth Amendment; and, (2) that the allusion to "common law" in the Seventh Amendment suggests that it is not the backdrop for the Sixth Amendment jury—are too remote to require rejoinder.

blessing of the Framers that explains this Court's frequent reminders that: "The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." *Smith* v. *Alabama,* 124 U. S. 465, 478 (1888). This proposition was again put forward by Mr. Justice Gray speaking for the Court in *United States* v. *Wong Kim Ark,* 169 U. S. 649 (1898), where the Court was called upon to define the term "citizen" as used in the Constitution. "The Constitution nowhere defines the meaning of these words [the Citizenship Clause]. . . . In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution." 169 U. S., at 654. History continues to be a wellspring of constitutional interpretation. Indeed, history was even invoked by the Court in such decisions as *Townsend* v. *Sain,* 372 U. S. 293 (1963), and *Fay* v. *Noia,* 372 U. S. 391 (1963), where it purported to interpret the constitutional provision for habeas corpus according to the "historic conception of the writ" and took note that the guarantee was one rooted in common law and should be so interpreted.[10] Cf. *United States* v. *Brown,* 381 U. S. 437, 458 (1965). In accordance with these precepts, sound constitutional interpretation requires, in my view, fixing the federal jury as it was known to the common law.

It is, of course, true that history should not imprison those broad guarantees of the Constitution whose proper scope is to be determined in a given instance by a blend

---

[10] While I disagreed with the Court on these occasions, my differences with the majority went to the conclusions that could properly be drawn from the common-law history of the writ and the precedents in this Court, not to the jurisprudential approach that took history as a point of departure.

of historical understanding and the adaptation of purpose to contemporary circumstances. Cf. *Katz* v. *United States,* 389 U. S. 347 (1967); *Estes* v. *Texas,* 381 U. S. 532, 595–596 (1965) (concurring opinion); *Olmstead* v. *United States,* 277 U. S. 438, 471 (1928) (Brandeis, J., dissenting); *United States* v. *Lovett,* 328 U. S. 303, 318 (1946) (Frankfurter, J., concurring).[11] B. Cardozo, The Nature of the Judicial Process (1921). This is not, however, a circumstance of giving a term "a meaning not necessarily envisioned . . . so as to adapt [it] to circumstances . . . uncontemplated." See my opinion concurring in the result in *Welsh* v. *United States,* 398 U. S. 333, 344 (1970). The right to a trial by jury, however, has no enduring meaning apart from historical form.

The second aspect of the Court's argument is that the number "12" is a historical accident—even though one that has recurred without interruption since the 14th century (see *ante,* at 89)—and is in no way essential to the "purpose of the jury trial" which is to "safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Ante,* at 100. Thus history, the Court suggests, is no guide to the meaning of those rights whose form bears no relation to the policy they reflect. In this context the 12-member feature of the classical common-law jury is apparently regarded by the Court as mere adornment.

This second justification for cutting the umbilical cord that ties the form of the jury to the past is itself, as

---

[11] "Broadly speaking, two types of constitutional claims come before this Court. Most constitutional issues derive from the broad standards of fairness written into the Constitution . . . . Such questions, by their very nature, allow a relatively wide play for individual legal judgment. The other class gives no such scope. For this second class of constitutional issues derives from very specific provisions of the Constitution. . . . They were defined by history. Their meaning was so settled by history that definition was superfluous. . . ." 328 U. S., at 321.

I see it, the most compelling reason for maintaining that guarantee in its common-law form. For if 12 jurors are not essential, why are six? What if New York, now compelled by virtue of *Baldwin* to provide juries for the trial of misdemeanors, concludes that three jurors are adequate "interposition between the accused and his accuser of the common-sense judgment of a group of laymen," and constitute adequate "community participation and [provide] shared responsibility which results from that group's determination of guilt or innocence"? The Court's elaboration of what is required provides no standard and vexes the meaning of the right to a jury trial in federal courts, as well as state courts, by uncertainty. Can it be doubted that a unanimous jury of 12 provides a greater safeguard than a majority vote of six? The uncertainty that will henceforth plague the meaning of trial by jury is itself a further sufficient reason for not hoisting the anchor to history.

2. The circumvention of history is compounded by the cavalier disregard of numerous pronouncements of this Court that reflect the understanding of the jury as one of 12 members and have fixed expectations accordingly. Thus in *Thompson* v. *Utah* a unanimous Court answered in the affirmative the question whether the Sixth Amendment jury "is a jury constituted, as it was at common law, of twelve persons, neither more nor less." 170 U. S. 343, 349 (1898),[12] and it appears that before *Duncan* no Justice of this Court has seen fit to question this holding, one that has often been reiterated. See *Patton* v. *United States,* 281 U. S. 276, 288 (1930), where

---

[12] The significance of this pronouncement cannot be minimized. The holding that retrial by a jury of eight was an *ex post facto* law is perforce built upon the conclusion that the jury of 12 was a right of substance. If the right were merely a procedure mandated by statute, it would not have required the *ex post facto* holding.

the Court reaffirmed earlier pronouncements and stated that the Sixth Amendment jury is characterized by three essential features: "(1) that the jury should consist of twelve men, neither more nor less; (2) that the trial should be in the presence and under the superintendence of a judge having power to instruct them as to the law and advise them in respect of the facts; and (3) that the verdict should be unanimous." See also *Maxwell* v. *Dow,* 176 U. S. 581, 586 (1900); *Rassmussen* v. *United States,* 197 U. S. 516, 527 (1905); *Andres* v. *United States,* 333 U. S. 740, 748 (1948) (unanimity).[13]  As Mr. Justice Frankfurter stated in *Gore* v. *United States,* 357 U. S. 386, 392 (1958), in applying a constitutional provision "rooted in history . . . a long course of adjudication in this Court carries impressive authority."

The principle of *stare decisis* is multifaceted.  It is a solid foundation for our legal system; yet care must be taken not to use it to create an unmovable structure. It provides the stability and predictability required for the ordering of human affairs over the course of time and a basis of "public faith in the judiciary as a source of impersonal and reasoned judgments." *Moragne* v. *States Marine Lines,* 398 U. S. 375, 403

---

[13] The Federal Rules of Criminal Procedure provide for a jury of 12, Fed. Rule Crim. Proc. 23, and as recently as last year lower federal courts have assumed this Court's commitment to the unanimous verdict of 12. *United States* v. *Fioravanti,* 412 F. 2d 407, 418 (C. A. 3d Cir. 1969); *Williams* v. *United States,* 332 F. 2d 36 (C. A. 7th Cir. 1964); see also, *e. g., United States* v. *Virginia Erection Corp.,* 335 F. 2d 868, 870 (C. A. 4th Cir. 1964); *United States* v. *Goldberg,* 330 F. 2d 30, 42 (C. A. 3d Cir. 1964); *Rogers* v. *United States,* 319 F. 2d 5 (C. A. 7th Cir. 1963); *Fournier* v. *Gonzalez,* 269 F. 2d 26 (C. A. 1st Cir. 1959); *Billeci* v. *United States,* 87 U. S. App. D. C. 274, 184 F. 2d 394 (1950); *Horne* v. *United States,* 264 F. 2d 40 (C. A. 5th Cir. 1959); *Hibdon* v. *United States,* 204 F. 2d 834 (C. A. 6th Cir. 1953).

(1970). See also *Helvering* v. *Hallock,* 309 U. S. 106 (1940); *Boys Markets* v. *Retail Clerks,* 398 U. S. 235 (1970); *Hertz* v. *Woodman,* 218 U. S. 205, 212 (1910); *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405–406 (1932) (Brandeis, J., dissenting). Woodenly applied, however, it builds a stockade of precedent that confines the law by rules, ill-conceived when promulgated, or if sound in origin, unadaptable to present circumstances. No precedent is sacrosanct and one should not hesitate to vote to overturn this Court's previous holdings—old or recent—or reconsider settled dicta where the principles announced prove either practically (*e. g., Moragne* v. *States Marine Lines, supra; Boys Markets* v. *Retail Clerks, supra*), or jurisprudentially (*e. g., Desist* v. *United States,* 394 U. S. 244, 256 (1969) (dissenting opinion)) unworkable, or no longer suited to contemporary life (*e. g., Katz* v. *United States,* 389 U. S. 347, 360 (1967) (concurring opinion)). See also *Welsh* v. *United States,* 398 U. S. 333 (1970); *Chimel* v. *California,* 395 U. S. 752 (1969); *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Estes* v. *Texas,* 381 U. S., at 595–596 (concurring opinion); *Warden* v. *Hayden,* 387 U. S. 294 (1967); *Swift & Co.* v. *Wickham,* 382 U. S. 111 (1965); *James* v. *United States,* 366 U. S. 213, 241 (1961) (separate opinion of HARLAN, J.). Indeed, it is these considerations that move me to depart today from the framework of *Duncan.* It is, in part, the disregard of *stare decisis* in circumstances where it should apply, to which the Court is, of necessity, driven in *Williams* by the "incorporation" doctrine, that leads me to decline to follow *Duncan.* Surely if the principle of *stare decisis* means anything in the law, it means that precedent should not be jettisoned when the rule of yesterday remains viable, creates no injustice, and can reasonably be said to be no less sound than the rule sponsored by those who seek

change, let alone incapable of being demonstrated wrong. The decision in *Williams,* however, casts aside workability and relevance and substitutes uncertainty. The only reason I can discern for today's decision that discards numerous judicial pronouncements and historical precedent that sound constitutional interpretation would look to as controlling, is the Court's disquietude with the tension between the jurisprudential consequences wrought by "incorporation" in *Duncan* and *Baldwin* and the counter-pulls of the situation in *Williams* which presents the prospect of invalidating the common practice in the States of providing less than a 12-member jury for the trial of misdemeanor cases.

## II

These decisions demonstrate that the difference between a "due process" approach, that considers each particular case on its own bottom to see whether the right alleged is one "implicit in the concept of ordered liberty," see *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937), and "selective incorporation" is not an abstract one whereby different verbal formulae achieve the same results. The internal logic of the selective incorporation doctrine cannot be respected if the Court is both committed to interpreting faithfully the meaning of the federal Bill of Rights and recognizing the governmental diversity that exists in this country. The "backlash" in *Williams* exposes the malaise, for there the Court dilutes a federal guarantee in order to reconcile the logic of "incorporation," the "jot-for-jot and case-for-case" application of the federal right to the States, with the reality of federalism. Can one doubt that had Congress tried to undermine the common-law right to trial by jury before *Duncan* came on the books the history today recited would have barred such action? Can we

expect repeat performances when this Court is called upon to give definition and meaning to other federal guarantees that have been "incorporated"?

In *Ker* v. *California,* 374 U. S. 23 (1963), I noted in an opinion concurring in the result that: "The rule [of 'incorporation'] is unwise because the States, with their differing law enforcement problems, should not be put in a constitutional strait jacket . . . . And if the Court is prepared to relax [federal] standards in order to avoid unduly fettering the States, this would be in derogation of law enforcement standards in the federal system . . . ." *Id.,* at 45–46. Only last Term in *Chimel* v. *California, supra,* I again expressed my misgivings that "incorporation" would neutralize the potency of guarantees in federal courts in order to accommodate the diversity of our federal system. I reiterate what I said in dissent in *Duncan,* 391 U. S., at 175–176: "[N]either history, nor sense, supports using the Fourteenth Amendment to put the States in a constitutional straitjacket with respect to their own development in the administration of criminal or civil law." Since we now witness the first major attempt to wriggle free of that "straitjacket," it is appropriate, I think, to step back and view in perspective how far the incorporation doctrine has taken us, and to put the spotlight on a constitutional revolution that has inevitably become obscured by the process of case-by-case adjudication.

A

The recent history of constitutional adjudication in state criminal cases is the ascendancy of the doctrine of *ad hoc* ("selective") incorporation, an approach that absorbs one-by-one individual guarantees of the federal Bill of Rights into the Due Process Clause of the Fourteenth Amendment, and holds them applicable to the States with all the subtleties and refinements born of history

and embodied in case experience developed in the context of federal adjudication. Thus, with few exceptions the Court has "incorporated," each time over my protest,[14] almost all the criminal protections found within the first eight Amendments to the Constitution, and made them "jot-for-jot and case-for-case" applicable to the States.

The process began with *Mapp* v. *Ohio,* 367 U. S. 643 (1961), where the Court applied to the States the so-called exclusionary rule, rendering inadmissible at trial evidence seized in violation of the Fourth Amendment, and thereby overruling *pro tanto Wolf* v. *Colorado,* 338 U. S. 25 (1949). See my dissenting opinion, 367 U. S., at 672. The particular course embarked upon in *Mapp* was blindly followed to its end in *Ker* v. *California,* 374 U. S. 23 (1963), where the Court made federal standards of probable cause for search and seizure applicable to the States, thereby overruling the remainder of *Wolf.* See my opinion concurring in the result, 374 U. S., at 44. Thereafter followed *Malloy* v. *Hogan,* 378 U. S. 1 (1964), and *Griffin* v. *California,* 380 U. S. 609 (1965), overruling *Twining* v. *New Jersey,* 211 U. S. 78 (1908), and *Adamson* v. *California,* 332 U. S. 46 (1947), and incorporating the

---

[14] In addition to separate opinions noted in the text, see, *e. g., Poe* v. *Ullman,* 367 U. S. 497, 522, at 539–545 (1961) (dissenting opinion); *Griswold* v. *Connecticut,* 381 U. S. 479, 499 (1965) (concurring in the judgment); *Lanza* v. *New York,* 370 U. S. 139, 147 (1962) (concurring opinion); *Gideon* v. *Wainwright,* 372 U. S. 335, 349 (1963) (concurring opinion); *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 80 (1964) (concurring in the judgment); *Barber* v. *Page,* 390 U. S. 719, 726 (1968) (concurring opinion); *Berger* v. *New York,* 388 U. S. 41, 89 (1967) (dissenting opinion); *Chimel* v. *California, supra; Ashe* v. *Swenson,* 397 U. S. 436, 448 (1970) (concurring opinion); *Coleman* v. *Alabama, ante,* p. 19 (1970) (separate opinion); *Bloom* v. *Illinois,* 391 U. S. 194, 215 (1968) (dissenting opinion); *Washington* v. *Texas,* 388 U. S. 14, 23 (1967) (concurring in the result); *Dickey* v. *Florida,* 398 U. S. 30, 38 (1970) (concurring opinion).

Fifth Amendment privilege against self-incrimination by holding that "the same standards must determine whether an accused's silence in either a federal or state proceeding is justified." 378 U. S., at 11. See my dissenting opinion in *Malloy,* 378 U. S., at 14, and my concurring opinion in *Griffin,* 380 U. S., at 615. The year of *Griffin* also brought forth *Pointer* v. *Texas,* 380 U. S. 400 (1965), overruling *Snyder* v. *Massachusetts,* 291 U. S. 97 (1934), and *Stein* v. *New York,* 346 U. S. 156, 194 (1953), by holding that the Sixth Amendment's Confrontation Clause applied equally to the States and Federal Government. See my opinion concurring in the result, 380 U. S., at 408. In 1967 incorporation swept in the "speedy trial" guarantee of the Sixth Amendment. *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967), and in 1968 *Duncan* v. *Louisiana, supra,* rendered the Sixth Amendment jury trial a right secured by the Fourteenth Amendment Due Process Clause. Only last Term the Court overruled *Palko* v. *Connecticut, supra,* and held that the "double jeopardy" protection of the Fifth Amendment was incorporated into the Fourteenth, and hence also carried to the States. *Benton* v. *Maryland,* 395 U. S. 784 (1969); see my opinion concurring in the result in *Klopfer,* 386 U. S., at 226; my dissenting opinion in *Duncan,* 391 U. S., at 171; my dissenting opinion in *Benton,* 395 U. S., at 801, and my separate opinion in *North Carolina* v. *Pearce,* 395 U. S. 711, 744 (1969).[15] In combination these cases have in effect restructured the Constitution in the field of state criminal law enforcement.

---

[15] The right to counsel appears not to have been explicitly "incorporated," although *Gilbert* v. *California,* 388 U. S. 263 (1967), implicitly does so. *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), purported to be a determination that "fundamental fairness" requires the State to afford trial counsel to the indigent accused. *Id.,* at 343. Although I have disagreed with particular holdings like *Gilbert* v. *California, supra,* where the Court held that the

There is no need to travel again over terrain trod in earlier opinions in which I have endeavored to lay bare the historical and logical infirmities of this "incorporationist" approach. On that score I am content to rest on what I said in dissent in *Duncan*, 391 U. S., at 171. I continue to consider the principles therein expressed as the sound basis for approaching the adjudication of state cases of the kind now before us. It is my firm conviction that "incorporation" distorts the "essentially federal nature of our national government," *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers*, 398 U. S. 281, 285 (1970), one of whose basic virtues is to leave ample room for governmental and social experimentation in a society as diverse as ours, and which also reflects the view of the Framers that "the security of liberty in America rested primarily upon the dispersion of governmental power across a federal system," 391 U. S., at 173. The Fourteenth Amendment tempered this basic philosophy but did not unstitch the basic federalist pattern woven into our constitutional fabric. The structure of our Government still embodies a philosophy that presupposes the diversity that engendered the federalist system.

That these doctrines are not only alive in rhetoric but vital in the world of practical affairs is evidenced by contemporary debate concerning the desirability of returning to "local" government the administration of many programs and functions that have in late years increasingly been centralized in the hands of the National Government.

---

States must arrange presence of counsel at lineups, see MR. JUSTICE WHITE's separate opinion in *United States* v. *Wade*, 388 U. S. 218, 250 (1967), which I joined, this is because those decisions incorrectly require, in my view, counsel in circumstances where his presence is not necessary under either the Sixth Amendment or the Due Process Clause. See my separate opinion in *Coleman* v. *Alabama*, decided today, *ante*, p. 19.

## B

But the best evidence of the vitality of federalism is today's decision in *Williams*. The merits or demerits of the jury system can, of course, be debated and those States that have diluted the common-law requirements evince a conclusion that the protection as known at common law is not necessary for a fair trial, or is only such marginal assurance of a fair trial that the inconvenience of assembling 12 individuals outweighs other gains in the administration of justice achieved by using only six individuals (or none at all as was the case in New York City).

The prevailing opinion rejects in *Baldwin* what would be the consistent approach, requiring affirmance, simply because New York City is the single jurisdiction in the Nation that sees fit to try misdemeanants without a jury. In doing so it, in effect, holds that "due process" is more offended by a trial without a jury for an offense punishable by no more than a year in prison than it is by a trial with a jury of six or less for offenses punishable by life imprisonment. This ignores both the basic fairness of the New York procedure and the peculiar local considerations that have led the New York Legislature to conclude that trial by jury is more apt to retard than further justice for criminal defendants in New York City.

I, for one, find nothing unfair in the New York system which provides the city defendant with an option, in lieu of a jury, of a bench trial before three judges, N. Y. C. Crim. Ct. Act § 40. Moreover, I think it counterproductive of fairness in criminal trials to hold by way of incorporation that juries are required of States in these days when congested calendars and attendant delays make what many students of criminal justice

feel is one of the most significant contributions to *injustice* and hardship to criminal defendants.

The statistics cited by the New York Court of Appeals and amplified in the briefs are revealing and trenchant evidence of the crisis that presently bedevils the administration of criminal justice in New York City. New York's population density, a factor which is, as noted by the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 5, 28 (1967), directly associated with crime, is twice that of Buffalo, the second largest city in the State. Statistics supplied by the Office of the State Administrator of the Judicial Conference of the State of New York show that: "From July, 1966 through December, 1968 the New York City Criminal Court disposed of 321,368 nontraffic misdemeanor cases; whereas in the next largest city, Buffalo, the City Court disposed of 8,189 nontraffic misdemeanor cases." 24 N. Y. 2d 207, 218, 247 N. E. 2d 260, 266 (1969). Thus, New York City's misdemeanor caseload is 39 times that of Buffalo's although its population is only 17 times greater. After today each of such defendants in New York is entitled to a trial by some kind of a jury. It can hardly be gainsaid that a jury requirement with the attendant time for selection of jurors and deliberation, even if not invoked by all defendants, will increase delays in calendars, depriving all defendants of a prompt trial. Impressive evidence suggests that this requirement could conceivably increase delays in New York City courts by as much as a factor of eight. A study done of the administration of the Municipal Court in Minneapolis shows that the requirement of a trial by jury in cases of intoxicated driving increased court delays there from three to 24 months. Note, Right to a Jury Trial for Persons Accused of an Ordinance Violation, 47 Minn. L. Rev. 93 (1962).

Notwithstanding this critical situation the Court concludes that the Constitution requires a procedure fraught with delay even though the American Bar Association Project on Standards for Criminal Justice, Trial By Jury, has recognized the New York City three-judge procedure as a possible compromise measure where jury trials are not permitted or waived, and the further fact that one-half the defendants tried for misdemeanors in New York City are acquitted.[16]

## III

Today's decisions demonstrate a constitutional schizophrenia born of the need to cope with national diversity under the constraints of the incorporation doctrine. In *Baldwin* the prevailing opinion overrides the consideration of local needs, but in *Williams* the Court seeks out a minimum standard to avoid causing disruption in numerous instances even though, *a priori*, incorporation would surely require a jury of 12. The six-man, six-month rule of today's decisions simply reflects the lowest common denominator in the scope and function of the right to trial by jury in this country, but the circumstance that every jurisdiction except New York City has a trial by a jury for offenses punishable by six months in prison obscures the variety of opinion that actually exists as to the proper place for the jury in the administration of justice. More discriminating analysis indicates that four States besides Florida authorize a jury of less than 12 to try felony

---

[16] The President of the Legal Aid Society in New York City recently reported that 49% of the society's clients who were tried in the New York City Criminal Court in 1967 (without a jury) were acquitted; there were 3,023 convictions after trial, 2,678 acquittals after trial. Speech at annual Judicial Conference of the Second Judicial Circuit of the United States, Lake Placid, N. Y., Sept. 14, 1968, reprinted in N. Y. L. J., September 25, 1968, p. 4.

offenses [17] and three States authorize a nonunanimous verdict [18] in felony cases, and at least two other States provide a trial without jury in the first instance for certain offenses punishable by more than one year with a right to *de novo* trial on appeal.[19]  Eight States provide for juries ranging from five to 12 to try crimes punishable by one year in prison, and one State has provided for a verdict by nine in a jury of 12.[20]  Five States first provide a bench trial for misdemeanors from which the defendant can seek a trial *de novo* by jury,[21] a procedure that this Court, in a federal trial, has deemed incompatible with the Sixth Amendment for putting the accused to the burden of two trials if he wishes a jury verdict.  See *Callan* v. *Wilson,* 127 U. S. 540 (1888).[22]

These varying provisions, reflecting as they do differing estimates of the importance of the jury in securing a fair trial and the feasibility of administering such a procedure given the local circumstances, and the extensive study and debate about the merits and demerits of the jury system, demonstrate that the relevance and proper role of trial by jury in the administration of criminal justice is yet far from sure.

---

[17] See the Court's opinion, *ante,* at 99 n. 45.

[18] See Appendix to this opinion.

[19] See *ibid.*

[20] See *ibid.*

[21] See *ibid.*

[22] "Except in that class or grade of offences called petty offences, which, according to the common law, may be proceeded against summarily . . . the guarantee of an impartial jury to the accused in a criminal prosecution, conducted . . . by . . . the United States, secures to him the right to enjoy that mode of trial from the first moment, and-in whatever court, he is put on trial for the offence charged. . . .  To accord to the accused a right to be tried by a jury, in an appellate court, after he has been once fully tried otherwise than by a jury, in the court of original jurisdiction . . . does not satisfy the requirements of the Constitution." 127 U. S., at 557.

"Incorporation" in *Duncan* closed the door on debate,[23] irrespective of local circumstances, such as the backlogs in urban courts like those of New York City, and has, without justification, clouded with uncertainty the constitutionality of these differing state modes of proceeding, see Appendix, pending approval by this Court; it now promises to dilute in other ways the settled meaning of the federal right to a trial by jury. Flexibility for experimentation in the administration of justice should be returned to the States here and in other areas that now have been swept into the rigid mold of "incorporation." I agree with THE CHIEF JUSTICE: "That the 'near-uniform judgment of the Nation' is otherwise than the judgment in some of its parts affords no basis . . . to read into the Constitution something not found there." Opinion of THE CHIEF JUSTICE in *Baldwin, ante,* at 77.

It is time, I submit, for this Court to face up to the reality implicit in today's holdings and reconsider the "incorporation" doctrine before its leveling tendencies further retard development in the field of criminal procedure by stifling flexibility in the States and by discarding the possibility of federal leadership by example.

## APPENDIX TO OPINION OF HARLAN, J.

A. Nonunanimous Verdict For Felony-Type Offenses

1. *Louisiana:* La. Crim. Proc., Code., Art. 782. (Verdict of nine out of 12 in cases *necessarily* punished by hard labor.)

2. *Oregon:* Constitution, Art. I, § 11; Ore. Rev. Stat. §§ 136.330, 136.610 (1967) (five out of six sufficient for verdict in a circuit court except in capital cases).

---

[23] See, *e. g.,* H. Kalven & H. Zeisel, The American Jury 5 (1966); Comment, Should Jury Verdicts Be Unanimous in Criminal Cases?, 47 Ore. L. Rev. 417 (1968).

3. *Texas:* Tex. Code Crim. Proc., Art. 36.29 (1966) (permitting verdict by less than 12 when juror is incapacitated).

B. Non-Jury Trial In Cases Punishable By More Than One Year's Imprisonment With *De Novo* Review

1. *Maryland:* Constitution, Declaration of Rights, Arts. 5, 21; Md. Ann. Code, Art. 51, § 18, Art. 52, § 13 (1968), Art. 66-1/2, §§ 48, 74, 75, 216, 325 (1967), § 327 (Supp. 1969); Md. Rules Proc. 743, 758. (Trial by jury appears not to be afforded in motor vehicle cases in the first instance even though some motor vehicle offenses carry a penalty of up to five years' imprisonment.)

2. *North Carolina:* Constitution, Art. I, § 13; *State* v. *Sherron,* 4 N. C. App. 386, 166 S. E. 2d 836 (1969); N. C. Gen. Stat. §§ 7A-272 (a), 7A-196 (b), 14-3 (1969). (District courts have jurisdiction to try, without a jury, all offenses below the grade of felony. Such offenses are denominated petty misdemeanors and the maximum sentence which may be imposed is a fine or *two* years' imprisonment.)

3. *Pennsylvania:* Constitution, Sched. Art. 5, § 16 (r) (iii) (offenses tried in the municipal division of the court of common pleas carrying penalties up to two years' imprisonment and indictable offenses under the motor vehicle laws for which punishment does not exceed three years' imprisonment).

C. 6-Man Jury For Misdemeanors

1. *Alaska:* Constitution, Art. I, § 11; Alaska Stat. §§ 11.75.030 (1962), 22.15.060, 22.15.150 (1967). (Jury of six in district magistrate's courts, which have jurisdiction of misdemeanors, punishable by up to one year's imprisonment.)

2. *Georgia:* Constitution, Art. I, § 2-105, Art. VI, § 2-5101; Ga. Code Ann. § 27-2506 (Supp. 1968); Ga.

Laws 1890–1891, pp. 935, 939, 942. (In county criminal courts, which have jurisdiction of misdemeanors—cases in which the maximum sentence imposable is a fine of up to $1000 or imprisonment for a term of up to 12 months or both—a defendant may demand a jury trial. Depending upon the county, however, a jury ranges in size from five to 12 persons. The Criminal Court of Atlanta, for example, tries misdemeanors with juries of five. In Hall County the same crimes are tried by juries of 12.)

3. *Iowa:* Constitution, Art. 1, § 9; Iowa Code §§ 602.15, 602.25, 602.39, 687.7 (1966). (Jury of six in municipal courts, which have jurisdiction of misdemeanors, carrying a maximum fine of $500 or imprisonment for one year or both.)

4. *Kentucky:* Constitution, §§ 7, 11, 248; Ky. Rev. Stat. §§ 25.010, 25.014, 26.400, 29.015 (1963). (Misdemeanors, carrying a maximum penalty of $500 or 12 months' imprisonment, are tried in inferior courts by a jury of six. Circuit courts, where a 12-member jury is used, have concurrent jurisdiction.)

5. *Mississippi:* Constitution, Art. 3, § 31, Art. 6, § 171; Miss. Code Ann. §§ 1831, 1836, 1839 (1956). (Jurisdiction of crimes punishable in the county jail may be tried in the justice of the peace courts by a six-man jury. Many such crimes have a one-year maximum term. Circuit courts have concurrent jurisdiction. Such crimes include, *e. g.,* offenses involving corruption in elections [Miss. Code Ann. §§ 2031, 2032], escape or aiding escape of prisoners [§§ 2133, 2134, 2135, 2141], public officers' interest in contracts [§§ 2301, 2302], and trade marks [§§ 2390, 2391].)

6. *Oklahoma:* Constitution, Art. 2, §§ 19, 20; Okla. Stat. Ann., Tit. 11, §§ 958.3, 958.6 (Supp. 1969–1970), Tit. 21, § 10 (1958). (In misdemeanor cases—those in which a sentence of up to one year's imprisonment may

be imposed—in courts of record, a defendant may demand a jury of 12; nine members of the jury may render a verdict.  For violations of city ordinances tried in courts not of record, the defendant may demand six jurors, five of whom may render a verdict.)

7. *Oregon:* Constitution, Art. I, § 11; Constitution of 1857, Art. VII, § 12; Ore. Rev. Stat. §§ 5.110 (1965), 46.040, 46.175, 46.180 (1967).  (Jury of six in county courts, which have jurisdiction of all crimes except those carrying the death penalty or life imprisonment.  Jury of six in district courts, which have jurisdiction of all misdemeanors, punishable by one year's imprisonment.)

8. *Virginia:* Constitution, Art. I, § 8; Va. Code Ann. §§ 16.1–123, 16.1–124, 16.1–126, 16.1–129, 16.1–132, 16.1–136, 18.1–6 (1960), 18.1–9 (Supp. 1968), 19.1–206 (1960).  (In courts not of record, which have jurisdiction of misdemeanors, punishable by up to one year's imprisonment, charges are tried without a jury.  The defendant may appeal as of right to the circuit court, where he receives a trial *de novo*.  All trials in the circuit court of offenses not felonious, whether in the first instance or on appeal, are with five jurors.)

### D. Non-Jury Trial For Misdemeanors Subject to *De Novo* Review

1. *Arkansas:* Constitution, Art. 2, § 10; Ark. Stat. Ann. §§ 22–709, 22–737, 26–301 (1962), 41–106, 43–1901, 43–1902, 44–115, 44–116, 44–509 (1964); see generally Greenebaum, Arkansas' Judiciary: Its History and Structure, 18 Ark. L. Rev. 152 (1964).  (No jury provided in municipal courts, which have jurisdiction of misdemeanors carrying a maximum penalty of one year's imprisonment.  Upon conviction, the defendant may appeal to the circuit court where he is entitled to a trial *de novo* before a common-law jury.)

2. *Maine:* Constitution, Art. I, §§ 6, 7; Me. Rev. Stat. Ann., Tit. 4, § 152 (Supp. 1970), Tit. 15, §§ 1, 451 (1965); Me. Rules Crim. Proc. 23 (b), 31 (a); *Sprague* v. *Androscoggin County,* 104 Me. 352, 71 A. 1090 (1908); letter dated Dec. 17, 1968, from Maine Attorney General's office to New York County District Attorney's office. (Maine district courts try misdemeanors—crimes punishable by a sentence of up to one year—without a jury. A defendant may appeal his conviction to the Superior Court, however, where he is entitled to a common-law jury.)

3. *New Hampshire:* Constitution, pt. 1, Arts. 15, 16, pt. 2, Art. 77; N. H. Rev. Stat. Ann. § 599:1 (Supp. 1969), §§ 502–A:11, 502–A:12, 502:18 (1968); *State* v. *Despres,* 107 N. H. 297, 220 A. 2d 758 (1966). (District and municipal courts try, without a jury, misdemeanors carrying a maximum term of imprisonment of one year. The defendant in these courts has an absolute right of appeal to the Superior Court where he may demand a jury of 12 in his trial *de novo.*)

4. *Rhode Island:* Constitution, Art. 1, §§ 10, 15; R. I. Gen. Laws Ann. §§ 12–3–1, 12–17–1, 12–22–1, 12–22–9 (1956); *State* v. *Nolan,* 15 R. I. 529, 10 A. 481 (1887). (There are no juries in the district courts, which have jurisdiction of misdemeanors—crimes punishable by a fine of up to $500 or imprisonment for up to one year or both. A defendant may appeal his conviction to the Superior Court where he is entitled to a trial *de novo* before a jury of 12.)

5. *Virginia:* Constitution, Art. I, § 8; Va. Code Ann. §§ 16.1–123, 16.1–124, 16.1–126, 16.1–129, 16.1–132, 16.1–136, 18.1–6 (1960), 18.1–9 (Supp. 1968). (In courts not of record, which have jurisdiction of misdemeanors, punishable by up to one year's imprisonment, charges are

tried without a jury. The defendant may appeal as of right to the circuit court, where he receives a trial *de novo* with five jurors).

MR. JUSTICE STEWART, dissenting in No. 188, *ante,* p. 66, and concurring in the result in No. 927.

I substantially agree with the separate opinion MR. JUSTICE HARLAN has filed in these cases—an opinion that fully demonstrates some of the basic errors in a mechanistic "incorporation" approach to the Fourteenth Amendment. I cannot subscribe to his opinion in its entirety, however, if only for the reason that it relies in part upon certain dissenting and concurring opinions in previous cases in which I did not join.

The "incorporation" theory postulates the Bill of Rights as the substantive metes and bounds of the Fourteenth Amendment. I think this theory is incorrect as a matter of constitutional history, and that as a matter of constitutional law it is both stultifying and unsound. It is, at best, a theory that can lead the Court only to a Fourteenth Amendment dead end. And, at worst, the spell of the theory's logic compels the Court either to impose intolerable restrictions upon the constitutional sovereignty of the individual States in the administration of their own criminal law, or else intolerably to relax the explicit restrictions that the Framers actually did put upon the *Federal* Government in the administration of criminal justice. All this, and much more, is elaborated in MR. JUSTICE HARLAN's separate opinion, and I would affirm the judgments in both No. 188 and No. 927 for substantially the reasons he states.[1]

---

[1] Like MR. JUSTICE HARLAN, I join Part I of the Court's opinion in No. 927, relating to the "alibi" issue.

The architect of the contemporary "incorporation" approach to the Fourteenth Amendment is, of course, MR. JUSTICE BLACK. See *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion).[2] And the separate opinion my Brother BLACK has filed today in No. 927 could serve as Exhibit A to illustrate the extraordinary habits of thought into which some of us have fallen in conditioned reflex to that erroneous constitutional doctrine. "Incorporation" has become so Pavlovian that my Brother BLACK barely mentions the Fourteenth Amendment in the course of an 11-page opinion dealing with the procedural rule the State of Florida has adopted for cases tried in Florida courts under Florida's criminal laws.[3] His opinion relies instead upon the "plain and obvious meaning" of the "specific words" of the Fifth Amendment and other "provisions of the Bill of Rights" which, together with "the history surrounding

---

[2] I have had occasion to state elsewhere my own understanding, for whatever it is worth, of the motivational origins of Fourteenth Amendment "incorporation":

"Shortly before Justice Jackson came to the Court, some of its then more junior members had embraced the comforting theory that the Fourteenth Amendment's substantive impact upon the states could be exactly measured by the specific restrictions that the first eight Amendments imposed upon the National Government. I call this a 'comforting' theory, because, for critics of the old Court's subjective approach to due process, it was a theory that appeared to give the Fourteenth Amendment objective content and definable scope." (Footnotes omitted.) P. Stewart, Robert H. Jackson's Influence on Federal-State Relationships, in Mr. Justice Jackson, Four Lectures in His Honor 57, 76 (1969).

[3] A worthy candidate for nomination as Exhibit B is the separate opinion filed today in *Coleman* v. *Alabama, ante,* p. 14, by my Brother DOUGLAS. In dealing with the procedure followed by Alabama in the administration of Alabama criminal law, my Brother's opinion advises us that "it is the Sixth Amendment that controls . . . ." And this statement is made in the name of "strict construction of the Constitution"!

the adoption of those provisions," make clear that "[t]he Framers . . . designed" those rights "to shield the defendant against state power."

Though I admire the rhetoric, I submit with all deference that those statements are, to quote their author, "plainly and simply wrong as a matter of fact and law . . . ." If the Constitution forbids the Florida alibi-defense procedure, it is because of the Fourteenth Amendment, and not because of either the "specific words" of the Bill of Rights or "the history surrounding" their adoption. For as every schoolboy knows, the Framers "designed" the Bill of Rights not against "state power," but against the power of the Federal Government.[4]

Surely MR. JUSTICE HARLAN is right when he says it is time for the Court to face up to reality.

---

[4] This is not to say that I would agree that the Fifth Amendment or any other provisions of the Bill of Rights would render unconstitutional a federal alibi procedure similar to Florida's. See n. 1, *supra.*