DA 13-0021

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 65

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

ROY JAMES CARTER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 11-142
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Wade Zolynski, Chief Appellate Defender, Lisa S. Korchinski, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

           Timothy C. Fox, Montana Attorney General, Pamela P. Collins, Assistant
Attorney General, Helena, Montana

           William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs: February 12, 2014
Decided: March 11, 2014

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Roy James Carter appeals from his conviction of the crime of accountability for criminal distribution of dangerous drugs, a felony, in the Twenty-First Judicial District Court, Ravalli County. The issue presented on appeal is whether Carter received ineffective assistance of counsel. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 On November 2, 2011, Richard Watson, a resident of Monroe, Washington, arrived at Carter's home in Missoula, Montana. Watson and his then-girlfriend had made the drive from Monroe for the purpose of selling approximately eight ounces of methamphetamine in Watson's possession. According to Watson, a friend named Chris Link had told Watson he "knew a guy that could get rid of quantity" of methamphetamine. Link introduced Watson to Carter. Carter was the "middleman" who would then introduce Watson to Billy Joe Johnson, the ultimate purchaser.

¶3 Watson and Johnson met at Carter's home that night. Watson testified he sold approximately three ounces of methamphetamine to Johnson. The transaction took place in Carter's bedroom with Carter present. Johnson wanted to purchase more of Watson's product, but did not have sufficient cash available at the time. It was agreed that Johnson would call Carter in the next day or two, and Watson and Carter would then drive out to Johnson's auto shop in Ravalli County and "get rid of the rest of it." Watson was also interested in seeing the shop and the vehicles Johnson was working on there. Watson was unfamiliar with the area, so Carter agreed to show him the way to the shop.

2

¶4    On November 4, Johnson called Carter.  Watson and Carter went to Johnson's shop.  Watson drove the vehicle he had brought from Washington, and Carter sat in the passenger seat and gave directions.  Watson testified that when the men arrived at the shop, he sold Johnson approximately two and a half ounces of methamphetamine.  Watson weighed out the quantity using scales he had brought with him.  Watson testified Carter was present in the shop for the transaction and stood four to five feet away as the other men weighed the methamphetamine and counted the cash.

¶5    Meanwhile, the Ravalli County Sheriff's Office had received a tip indicating Johnson was involved in dealing methamphetamine.  Detective Jason Basnaw had learned that two men driving a vehicle with Washington State license plates would be arriving at Johnson's shop to deliver methamphetamine.  Basnaw and another detective hoped to intercept the vehicle before it arrived at the shop.  When they arrived at the shop, they saw a vehicle with Washington plates already parked in front.  Soon after spotting the vehicle, Basnaw saw Johnson, Watson, and Carter exit the shop.  The detectives detained the men and searched them for weapons, at which time Basnaw found a plastic baggie containing approximately an ounce of methamphetamine in Johnson's vest pocket.

¶6    Basnaw obtained search warrants for the shop and the vehicle.  In the shop, officers found two baggies containing methamphetamine.  They also found digital scales commonly used to measure methamphetamine and two "hide-a-cans," empty soda cans modified to have the look and feel of an unopened can, often used in drug trafficking.  In the vehicle driven by Watson, officers found a camera bag containing another set of

3

scales, two baggies of methamphetamine, and approximately $6,300 in cash. The three men were arrested. At booking, inventory searches were conducted. Carter was carrying $1,080 in cash. Johnson and Watson were carrying $2,359 and $4,082 in cash, respectively. A search of the call logs on three cell phones seized from Johnson showed nine calls between Johnson and Carter from November 2 to November 4.

¶7 Carter was charged by information with criminal distribution of dangerous drugs, criminal possession of dangerous drugs with intent to distribute, and use or possession of property subject to criminal forfeiture. His attorney moved to preclude "any testimony or reference to acts or omissions which Defendant Roy Carter may be legally accountable for or have conspired in the commission of as Defendant Roy Carter is not charged with accountability for or conspiracy to commit any act." The State then amended the information, charging Carter with accountability for criminal distribution of dangerous drugs, conspiracy, and use or possession of property subject to criminal forfeiture. Carter moved to dismiss the amended information on the grounds that he was prejudiced by the untimely amendment and could not be convicted of both a conspiracy charge and the underlying offense. The State filed a second amended information, charging Carter with accountability for criminal distribution of dangerous drugs or, in the alternative, conspiracy, and use or possession of property subject to criminal forfeiture. Carter also moved to dismiss the second amended information, and the motion was denied. Following a jury trial, Carter was found guilty of accountability for criminal distribution of dangerous drugs. He was committed to the custody of the Department of Corrections for fifteen years, with ten years suspended.

4

## STANDARD OF REVIEW

¶8 Claims of ineffective assistance of counsel raise mixed questions of law and fact, which we review de novo. *State v. St. Germain*, 2007 MT 28, ¶ 14, 336 Mont. 17, 153 P.3d 591.

## DISCUSSION

¶9 Carter claims his attorney provided ineffective assistance by moving to preclude evidence of accountability or conspiracy, because the motion alerted the State to what he refers to as its charging error. Carter claims the actions of his attorney prompted the State to amend the charges and thereby assured his conviction.

¶10 We apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), to determine whether counsel provided ineffective assistance. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. The defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Whitlow*, ¶ 10. We need not address both components of this standard if the defendant fails to prove one. *State v. Miner*, 2012 MT 20, ¶ 11, 364 Mont. 1, 271 P.3d 56.

¶11 In evaluating whether counsel's performance was deficient, we apply a strong presumption that counsel acted "'within the wide range of reasonable professional assistance.'" *Whitlow*, ¶ 21 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). The defendant must show "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Whitlow*, ¶ 10 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). A reviewing

5

court must avoid the distortions of hindsight and the temptation to second-guess counsel's performance after an adverse result. *Bomar v. State*, 2012 MT 163, ¶ 19, 365 Mont. 474, 285 P.3d 396. The Sixth Amendment does not guarantee perfect advocacy, and success is not the measure of effective representation. *Bomar*, ¶ 19.

¶12    Our legal system "is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." *Williams v. Fla.*, 399 U.S. 78, 82, 90 S. Ct. 1893, 1896 (1970). Rather, it is subject to rules and procedures designed to "avoid surprise, aid the administration of the trial courts and provide an orderly resolution of the charge." *State ex rel. Carkulis v. Dist. Ct.*, 229 Mont. 265, 273, 746 P.2d 604, 609 (1987); *see also* § 46-1-103(2), MCA (Rules of Criminal Procedure "secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay."). A criminal trial is, above all, a search for truth, not a game of surprise or concealment. *State v. Davidson*, 266 Mont. 404, 410, 880 P.2d 1331, 1335 (1994); *Carkulis*, 229 Mont. at 272, 746 P.2d at 609; *State ex rel. Sikora v. Dist. Ct.*, 154 Mont. 241, 247-48, 462 P.2d 897, 901 (1969). Thus, to avoid unnecessary surprise and delay, a defendant is required to give pretrial notice of affirmative defenses, to provide a list of the witnesses who will be called at trial, and to disclose the statements of those witnesses. *Carkulis*, 229 Mont. at 272-73, 276, 746 P.2d at 609, 611. The defendant is not entitled to "await the end of the State's case before announcing the nature of his defense . . . ." *Williams*, 399 U.S. at 85, 90 S. Ct. at 1898.

¶13    Carter's argument that his attorney's performance fell below reasonable professional standards because he failed to "conceal [his] cards" until the State had

6

concluded its presentation of evidence is entirely without merit. *Williams*, 399 U.S. at 82, 90 S. Ct. at 1896. On the contrary, the record reveals that Carter's attorney was a diligent advocate for his client who challenged the State's case at every turn. Carter was simply not entitled to lie in wait and ambush the State by objecting to the charges mid-trial. The efforts of Carter's attorney were well within the wide range of reasonable professional conduct, and the fact of Carter's conviction does not establish that he received ineffective representation.

¶14 Having failed to show that the performance of counsel was deficient, Carter cannot sustain his burden under the *Strickland* standard. 466 U.S. at 700, 104 S. Ct. at 2071. It is unnecessary to address whether Carter was prejudiced by the actions of counsel. *Miner*, ¶ 11. Nevertheless, we also note that "[c]riminal accountability is not considered a substantive separate offense, but merely a conduit by which to find a person criminally liable for the acts of another." *State v. Tower*, 267 Mont. 63, 67-68, 881 P.2d 1317, 1320 (1994). We have consistently reaffirmed this principle. *State v. Tellegen*, 2013 MT 337, ¶¶ 8-9, 372 Mont. 454, 314 P.3d 902. The State was not required to set forth a theory of accountability in the charging documents. *Tower*, 267 Mont. at 67, 881 P.2d at 1320. Under well-settled Montana law, Carter could have been convicted of criminal distribution of dangerous drugs on a theory of accountability regardless of whether the State had amended its information. *Tower*, 267 Mont. at 67, 881 P.2d at 1320.

¶15    For the reasons stated above, the conviction is affirmed.


                                        /S/ MIKE McGRATH


We Concur:


/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ JIM RICE